UNITED STATES of America ex rel. Edgar SMITH, Relator,

v.

STATE of NEW JERSEY and the Principal Keeper of the State Prison at Trenton, New Jersey, Respondents.

Civ. A. Nos. 1027-59, 1028-59.

United States District Court
D. New Jersey.

Jan. 18, 1962.

William Richter, New York Bar, New York City, for relator; Robert W. Hicks, Washington, D. C. Bar, of counsel.

Guy W. Calissi, Bergen County Pros., Hackensack, N. J., William C. Brudnick, Sp. Asst. Pros., Hackensack, N. J., for respondents.

LANE, District Judge.

Petitioner Edgar Smith was convicted of murder in the first degree in the Bergen County Court. As the jury rendered its verdict without a recommendation for life imprisonment, the mandatory death sentence followed. On appeal to the New Jersey Supreme Court, a unanimous court affirmed the conviction. State v. Smith, 27 N.J. 433, 142 A.2d 890 (1958). Petitioner subsequently filed a motion with the trial court for a new trial. The motion was denied. Again, the New Jersey Supreme Court unanimously affirmed the action of the lower court. State v. Smith, 29 N.J. 561, 150 A.2d 769 (1959). Certiorari to the Supreme Court of the United States was applied for and denied. Smith v. New Jersey, 361 U.S. 861, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959).

Petitioner, Edgar Smith, presently confined at the New Jersey State Prison, now seeks a writ of habeas corpus under 28 U.S.C. § 2254. The application was originally made on November 19, 1959, to the United States District Court before the late Judge Morrill. On November 23, 1959, the court stayed execution and issued an order to show cause to the State of New Jersey why petitioner should not be permitted to amend his applications and for such other relief as might be proper, returnable November 30, 1959. The court heard oral argument and ordered the production of (1) the transcript of the trial; (2) the transcript of the hearing on the motion for a new trial; (3) the briefs and appendices on the first appeal, the second appeal, and the petition for certiorari to the United States Supreme Court. The court requested counsel for petitioner and for the State each provide a document entitled "Designation of Record" wherein there was to be annotated with reference to the record the claims and crossclaims of each side. Counsel furnished these documents. On March 30, 1961, the petition was reassigned. On May 5, 1961, this court permitted the filing of an amended petition, and on June 5, 1961, heard oral argument.

Petitioner has raised numerous legal grounds which he alleges entitle him to the Great Writ. He has brought some of these to the attention of the New Jersey state courts in the original trial or on the motion for a new trial. The state courts have been unable to rule upon many of the other grounds as petitioner argued them for the first time when he sought certiorari to the United States Supreme Court from the denial of

a motion for a new trial and in the petition presently before this court.

An examination of the record shows that petitioner raised the following points in his first appeal to the New Jersey Supreme Court:

(1) The admission of enlarged color photographs and transparencies was both improper and prejudicial;

(2) The charge was erroneous because the trial judge (a) incorrectly stated the law as to the length of time necessary for premeditation; (b) did not properly charge that the jury could find reasonable doubt due to lack of evidence; (c) did not properly distinguish between first and second degree murder; (d) limited his charge as to the testimony of the time of the actual killing to the credibility of the doctor and not as to the whereabouts of the defendant;

(3) The polling of the jury was improper;

(4) Exhibit S–84 was erroneously admitted into evidence as a confession because (a) its acknowledgment was improper; (b) the defendant did not know the cause of death and condition of the body of the victim when he allegedly confessed; and,

(5) The verdict was the result of passion, prejudice, and partiality because (a) evidence was introduced as to the condition of the victim's body, and the blood on petitioner's clothes; (b) the color photographs and transparencies were introduced; (c) comments of the prosecutor and judge were improper.

The New Jersey Supreme Court rejected petitioner's arguments, and on its own motion found the confession to be properly admitted on "all conceivable legal grounds." State v. Smith, 27 N.J. 433, 142 A.2d 890 (1958). Smith failed to seek certiorari to the United States Supreme Court.

Petitioner thereafter moved for a new trial on new grounds. The trial court denied the motion and petitioner appealed to the New Jersey Supreme Court raising the following points:

(1) Dr. Gilady should be subpoenaed to resolve any doubt existing as to the time of the killing;

(2) The alibi of D. H. is now questionable because newly-discovered evidence would discredit D. H.'s testimony;

(3) It was error to take testimony on the motion for a new trial without the presence of petitioner;

(4) It was error to charge the petitioner with the burden of proof on the motion for a new trial;

(5) It was error to restrain the cross-examination of witness Wastog by petitioner's attorney at the hearing on the motion for a new trial.

The New Jersey Supreme Court again affirmed the lower court's decision denying all of petitioner's contentions. State v. Smith, 29 N.J. 561, 150 A.2d 769 (1959). From this decision, defendant petitioned the United States Supreme Court for certiorari, raising the following points:

(1) The confession was involuntary;

(2) Defendant was not given a fair and impartial trial;

(3) Defendant was inadequately represented by counsel;

(4) The trial court did not properly charge all degrees of homicide and, in particular, manslaughter;

(5) Defendant was not present at the hearing on the motion for a new trial.

The Supreme Court denied certiorari. Smith v. N. J., 361 U.S. 861, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959).

In the amended petition filed in this court, petitioner has raised a great number of issues. It is most difficult to determine from the relator's petition exactly what his points are. Viewing the

petition most favorably to the relator, we have succeeded in dividing his arguments into the following twelve categories:

1. An accumulation, combination and aggravation of errors in the state court constitutes a denial of due process.

2. The State should produce the tape recording of a truth serum test that had been administered to petitioner.

3. Petitioner was unlawfully arrested.

4. Exceptions should have been taken to the trial court's charge before and not after the jury retired.

5. The sex-murder theory of the case was abandoned without a proper instruction to the jury.

6. Petitioner's counsel at the trial level was inadequate.

7. A new trial was improperly denied.

8. The charge of the trial court on the question of the confession was fundamentally wrong.

9. The confession of the petitioner was involuntary.

10. The judge did not allow the jury to reconsider the voluntary nature of the confession after he had determined that it was voluntary.

11. The trial court was fundamentally wrong in its failure to charge lawfully and properly on the relator's defenses.

12. The charge of the trial court was erroneous in that the judge failed to charge all degrees of homicide, including manslaughter.

## I.

## ISSUES NOT RAISED IN THE STATE COURTS.

### Categories 1–8.

█ Petitioner has neglected to present his constitutional contentions on Categories 1 through 8 of the twelve arguments he wishes to advance before this court in either his original appeal to the New Jersey Supreme Court or in his motion for a new trial and its subsequent appeal. Moreover, an examination of the record reflects that the petitioner, Edgar Smith, has failed to take advantage of the New Jersey habeas corpus statute, N.J.S.A. 2A:67-1, wherein he might have offered argument on these eight points. Instead of exhausting his state remedies on these eight issues, petitioner has for the first time raised these issues for consideration in this court.

Section 2254 of Title 28 United States Code, provides:

"An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

█ Accordingly, affirmative relief must be withheld from a state prisoner until he has exhausted the remedies available in the state courts. Section 2254 requires this as a matter of national policy when the United States District Court exercises its power to entertain and dispose of a petition for habeas corpus. Where the State provides a procedure such as habeas corpus for determining the federal question, and it is available to the petitioner, the District Court will proscribe itself from being the first to decide that question. Ex

parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572 (1944). The dual system of government in the United States requires that the State has the first opportunity to decide such issues when persons under the State's process raise them. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950). For the reason that the petitioner has failed to disclose the exhaustion of his state remedies or the existence of such circumstances that would render the state corrective process as ineffective on eight of the twelve questions raised in the petition pending in the United States District Court, we shall be unable to render a decision on the merits of these eight issues. Comity demands this result.

## II.

### ISSUES RAISED IN THE STATE COURTS.

#### Categories 9–10.

When Smith appealed the jury's verdict of guilty, the New Jersey Supreme Court affirmed the lower court's decision. State v. Smith, 27 N.J. 433, 142 A.2d 890 (1958). Smith neglected to make an application for a writ of certiorari. Before a district court will entertain a petition for habeas corpus, the petitioner must exhaust the state court remedies, including the filing of an application for a writ of certiorari. Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950).

Thus, it might be argued that petitioner has failed to exhaust his state remedies by reason of the omission to apply for certiorari to the United States Supreme Court. However, subsequent to his first appeal to the New Jersey Supreme Court, relator Smith filed a motion for a new trial with the trial court. The trial court denied the motion and the New Jersey Supreme Court unanimously affirmed the action of the lower court. State v. Smith, 29 N.J. 561, 150 A.2d 769 (1959). Petitioner then applied for certiorari to the Supreme Court of the United States. The Court denied the application. State v. Smith, 361 U.S. 861, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959). If the United States Supreme Court had granted certiorari on petitioner's application, the Court would have had jurisdiction to consider all of the substantial federal questions determined in the earlier stages of the litigation. See Reece v. Georgia, 350 U.S. 85, 87, 76 S.Ct. 167, 100 L.Ed 77 (1955). Therefore, the Supreme Court could have then reviewed all of the alleged constitutional injustices that petitioner argued in the original appeal of the trial court's decision to the New Jersey Supreme Court. Accordingly, as to those issues that the New Jersey Supreme Court considered on the appeal from the jury's verdict in State v. Smith, 27 N.J. 433, 142 A.2d 890 (1958), this court feels that petitioner has exhausted the necessary state remedy of an application for a writ of certiorari.

Thus, Edgar Smith has satisfied the exhaustion policy of section 2254 of Title 28 United States Code; he has exhausted the remedies available in the state courts on all questions brought to the attention of the New Jersey Supreme Court on the appeal from the jury's verdict and the appeal from denial of a motion for new trial.[1]

The New Jersey Supreme Court's treatment of Smith's confession "as

---

1. Relator Smith may still have open to him further avenues of relief in the state courts, by way of a New Jersey habeas corpus proceeding, on the points raised in the first appeal to the New Jersey Supreme Court. See N.J.S.A. 2A:67–1 et seq. But then relator Smith would just be going through another round on the same issues in the New Jersey courts. 28 U.S.C. § 2254 does not require repetitious application to state courts. It is unnecessary for petitioner. Smith to pursue in the state courts a collateral remedy based on the same issues and evidence. Brown v. Allen, 344 U.S. 443, 448–449, Note 3, 73 S.Ct. 397, 97 L.Ed. 469 (1953); U. S. ex rel. Master v. Baldi, 198 F.2d 113, 116 (3 Cir. 1952).

though its introduction has been opposed upon every conceivable legal ground," State v. Smith, 27 N.J. 443, 457–458, 142 A.2d 890, 904 (1958), encompasses Categories 9 (the confession of the petitioner was involuntary) and 10 (the trial judge did not allow the jury to reconsider the voluntary nature of the confession after the judge determined it was voluntary). Since we have perceived that the petitioner has exhausted his available state remedies on the points raised in the first appeal to the New Jersey Supreme Court, this court will analyze the merits of issues 9 and 10.

Relator Smith's ninth argument is that his confession was involuntary.

The police took Smith into custody at approximately 11:30 p. m., March 5, 1957. At 12:50 p. m., March 6, 1957, Smith gave his confession. During the 13-hour and 20-minute interval between being taken into custody and the confession, Smith claims the police coerced his confession.

The petitioner's confession played an important part in his conviction. It is the duty of this court to determine whether the petitioner's confession was admitted into evidence in the state court in accordance with the standards of admissibility that the Due Process clause of the Fourteenth Amendment calls for.

"No single litmus-paper test for constitutionally impermissible interrogation has been evolved: * * * The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker?" Culombe v. Connecticut, 367 U.S. 568, 601–602, 81 S.Ct. 1860, 1878, 6 L.Ed.2d 1037 (1961). This is the formula to be applied in determining whether Smith's confession was voluntary.

The United States Supreme Court has implemented an exclusionary rule under its supervisory powers over the administration of federal criminal justice that

holds, "a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological * * *.'" Upshaw v. United States, 335 U.S. 410, 413, 69 S.Ct. 170, 172, 93 L. Ed. 100 (1948). See McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L. Ed.2d 1479 (1957). This safeguard requires that persons arrested in federal criminal cases be brought without unnecessary delay before a judicial officer.

The Supreme Court, however, has failed to extend this rule through the Fourteenth Amendment to state criminal cases. Culombe v. Connecticut, 367 U.S. 568, 600–602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). New Jersey has rejected McNabb, ruling that confessions are not inadmissible merely because they are obtained from one who is illegally in custody. State v. Wise, 19 N.J. 59, 115 A.2d 62 (1955). Also see State v. [Clarence] Smith, 32 N.J. 501, 161 A.2d 520 (1960). The police at no time brought Edgar Smith before a committing magistrate during the 13-hour and 20-minute period of detention preceding his confession. Even assuming, however, that the police illegally held the petitioner, this court would be unable to rule that petitioner's constitutional protections were violated by that fact in itself. The illegality of the custody, if any, is another factor that we must consider in determining whether Smith's confession was voluntary.

The courts must allow the police to conduct a reasonable interrogation of suspects. A proper interrogation, among other things, will aid law officers in their efforts to determine whether a suspect's account of his movements is true or untrue and to discover facts that may be germane to the crime. To quote the New Jersey Supreme Court, "While police brawn and bluster to extort confessions cannot be a substitute for brains and leg work and will not be coun-

tenanced, the public interest requires that interrogation, and that at a police station, not completely be forbidden, so long as it is conducted fairly, reasonably, within proper limits and with full regard to the rights of those being questioned." State v. [Clarence] Smith, 32 N.J. 501, 534, 161 A.2d 520, 537 (1960). If the police interrogation of relator Smith failed to violate his constitutional guarantees, the confession's admission at his trial was correct.

■ In determining whether the confession was the product of an essentially free and unconstrained choice by relator Smith, we must analyze the occurrences during the 13-hour and 20-minute interval between Smith's being taken into custody and his confession. Although some of the facts surrounding this period are in dispute, the most credible and convincing evidence is as follows:

The murder of Victoria Zielinski by the total crushing of her skull occurred about 9:30 p. m. on March 4, 1957, in the sandpit at Mahwah, New Jersey. At the time of the murder Edgar Smith was twenty-three years of age with a wife and child. Prior to the crime Smith had worked in various jobs for short periods of time. He last worked with a seat cover and automobile muffler shop. They had hired him to help install hydraulic lifts and other equipment in its garage. After working for about a week, Smith was discharged from his job on March 4, 1957. At trial, Smith testified that he had been ill for approximately four days prior to the night of the murder.

Petitioner Smith testified that he went to sleep Monday evening, March 4, 1957 —the night of the murder—about 10:00 p. m., and awoke about 8:30 a. m., Tuesday; and further that he had been lying awake in bed for approximately one and one-half hours before the police picked him up at approximately 11:30 on Tuesday evening, March 5, 1957. He was taken from his mother-in-law's home in Ridgewood, New Jersey, by Detective Gordon Graber and other officers to the Mahwah police headquarters and there interrogated. Smith was originally questioned in the presence of Detective Graber of the Bergen County Prosecutor's office, Captain DeMarco of the same office, First Assistant Prosecutor Fred Galda, Chief Smith of Mahwah, and several newspaper reporters. Smith stated to these men that he had become sick on the night of the homicide and had thrown up on Wycoff Avenue in Ramsey and in the area of the sandpit. He stated that he had ruined his pants and shoes during this illness and had therefore thrown them away. At his request he was taken to Mechanic Street in Ramsey where he showed the detectives the garbage can in which he had thrown his shoes. The police then went to the scene of the crime as Smith wanted to show them where he had vomited at 7:40 p. m. on the previous evening. No evidence of vomiting could be found. The police thereafter walked to the place where the body of the victim had been found; Smith, however, refused to go there and denied that he had ever been there. The men then left the gravel pit and drove to Smith's trailer to find the clothes he had worn the night before. He told them that the jacket he had worn was at his mother-in-law's and, "It will not do you much good because I washed it the day before." After they left the trailer camp the party proceeded to Pulis Avenue in a fruitless attempt to find Smith's trousers. On the return trip to police headquarters the party stopped to search the area along Wycoff Avenue for signs of vomiting. Again, they were unsuccessful.

At 3:30 a. m., March 6th, Detective Graber went to Smith's mother-in-law's house where he recovered the jacket Smith had been wearing the night of the murder. The police made a second trip with Smith to find the places where he allegedly had thrown up. This trip was as unsuccessful as the first. During these trips, Smith complained about the cold.

After this second trip, Smith was questioned more extensively about the

clothes he had been wearing on March 4th, and he said, "If you are looking for a fall guy, why don't you grab D. H.?" (At the trial, it developed that Smith's main defense was that an acquaintance, D. H., not he, was the murderer.) When further inquiry was made about the shoes, he said he could explain the presence of blood on them. And he related he had borrowed friend Joseph Gilroy's car, a Mercury convertible, at about 6:30 p. m. on March 4th, and when he first became ill that evening he had fallen out of Gilroy's car, scraping his knees. Upon returning home, he decided to put on his good shoes. Undesirous of soiling the rug with his bloody knees, as he had already taken off his soiled trousers, he pulled the old shoes over by his knees and knelt on them as he reached for other shoes underneath the bed. At this point in the interrogation, someone went out and got coffee and buns for everyone, including Smith.

About 5:00 a. m., March 6th, it was planned to have Smith examined by Dr. Gilady. Detective Sinatra then took Smith out for breakfast. Smith was allowed to sit in the front seat of the car near the heater because he had complained of being cold and was shivering.

It is clear that between 11:30 p. m., March 5th, and 5:00 a. m., March 6th, petitioner, in the presence of various officers, spent two or three hours attempting to establish an alibi in regard to his missing shoes and pants. During these trips he was cold. After complaining of this, Galda loaned him his overcoat for about 45 minutes. He wore this on one of the trips. On another occasion he sat in the front seat of the car near the heater. The testimony also shows that he was given coffee and buns during the early morning hours and taken out for breakfast before going to the doctor.

After breakfast and at 7:55 a. m., March 6th, Dr. Gilady, the Bergen County medical examiner, examined Smith at his office. The doctor conducted the medical examination in the presence of the police officers. He stripped Smith naked, looking for bruises and other conditions. He found four little lentil-size bruises on his left knee and kneecap which were dark blue in color and were of recent origin. The bruise on the right knee was larger than the one on the left knee. Smith had a linear bruise on his left index finger which was also of recent origin. Smith told the doctor he did not know how he had gotten the bruises. The doctor later testified that Smith's general condition at the time of the examination was normal, that he was alert, had no difficulty breathing, his pulse was normal, his respiration was normal, and he walked without difficulty.

After the examination, petitioner was taken to the Prosecutor's office where Detectives DeLisle, Spahr, Graber, Sinatra, O'Har, Prosecutors Calissi and Galda, and Louis Kalstad, a member of the then grand jury panel, and others were present. Pictures of Smith were taken. The clothes he was wearing were exchanged in favor of a coverall. A blood spot on the neckline of his T-shirt was removed for analysis. Smith said he had cut his neck shaving, but no sign of a cut was found. His fingernails were cut at the very edge for examination.

At approximately 10:00 a. m., March 6th, defendant indicated greater willingness to talk. Detectives Spahr and DeLisle had taken Smith into a separate room to pursue the questioning. Detective DeLisle asked Smith what the girl did to him and he said, "She hit me." He started to cry and asked for water and a cigarette and asked to speak with a priest from Don Bosco High School. The police summoned the priest. After a slight interval Smith composed himself, whereupon he admitted driving Victoria Zielinski to the sandpit in Gilroy's automobile on the night of March 4th. Victoria Zielinski, the relator claimed, had "babbled" something about "school and a note" and she had gotten excited, attempting to run from the car. Smith further related that he had hit her "a good shot." The interrogation stopped while Smith talked with the priest from Don Bosco High School.

Subsequent to the appearance of the priest and at approximately 12:50 p. m., March 6, 1957, Smith gave the now contested confession. A reading of the confession shows that the questioning began at 12:59 p. m., March 6th, when Smith was asked and agreed to give a statement "concerning an incident" that occurred on March 4th. He first asked for and was given some coffee. He said that his mind was fuzzy as to some of the events and was told he could interrupt as they went along. He described his activities of the early part of the day in question. He then related that the victim waved him down about 8:40 p. m. and asked for a ride. While in the car she requested that they go to the sandpit to talk. At the sandpit, Smith stated that she got out of the car after they were there for a short time, saying that he was like the rest of the boys. He claimed he was unaware of what she meant by this remark. He further remarked that he tried to keep her from leaving as he felt obligated to take her home. He swung at her, but didn't remember whether he hit her because his hand didn't hurt. The next thing he remembered was getting back into the car and what happened in between was just vague. He then describes leaving the scene, going home and cleaning up, returning to the scene to find one of his shoes which he had lost, and going to sleep at his mother-in-law's house around 10:00 p. m., having forgotten all about the earlier part of the evening. The next morning when he heard the news something snapped in his head. That afternoon Gilroy and D. H. picked him up. D. H. said the police were looking for a Mercury and Smith said that remark really hit him hard, "I must have been the one who really did it." Smith then was shown and identified the clothing he had worn the evening of the murder. He was questioned more extensively about the actual killing and he continually said, "I remember swinging once. I don't remember whether I hit her or not. Everything just—like somebody turned the light out." Smith thereafter described a diagram he had previously drawn, showing his travels on the night in question.

At this stage he was told to take all the time he wanted in answering the questions and was asked if he wanted more coffee. Next, he told how Vickie hit him three times; he, however, denied kissing her or attempting to get fresh. A short recess was then called to give Smith a rest. After being asked if he wanted anything, Smith requested a glass of milk. The questioning resumed when Smith said that the police had treated him better than he had expected to be treated. At 2:15 p. m. this portion of the statement was concluded.

It resumed at 2:55 p. m. at the scene of the crime where the police and Smith had driven to reenact the events of the day in question. Smith reenacted his travels and actions on that night, but still claimed he had blacked out after he first swung at the victim. The statement was concluded at 3:45 p. m. The police and Smith arrived at the Mahwah Police Headquarters at 4:05 p. m. where Smith was held for arraignment.

Detective DeLisle visited Smith in the jail on March 11th for the purpose of having Smith read and sign the confession statement. After spending about 35 minutes reading the statement, Smith refused to sign it, stating his attorney had told him not to sign anything. However, when DeLisle asked Smith if the statement were accurate, Smith said it was. Smith commented upon how accurate the statement was, and expressed amazement that the court stenographer could take down such a statement with such accuracy. Hence, petitioner acknowledged the confession five days after he had made it. Petitioner now argues that Detective DeLisle deceived him; that the detective, in effect, coerced him into acknowledging the statement as his even though DeLisle knew Smith's attorney had advised him not to acknowledge any paper writing.

Directly before that point in the trial when Prosecutor Guy W. Calissi offered

the confession into evidence, he examined four of the six people present during the confession. Henry H. Voss, the Chief of Police of the Borough of Ramsey; Assistant Prosecutor Fred C. Galda; Chief Charles E. Smith of the Township of Mahwah; Detective Walter H. Spahr of the Prosecutor's staff; Arthur J. Ehrenbeck, the court stenographer, and Louis M. Kalstad, a member of the grand jury, were in the Bergen County Prosecutor's office when Smith confessed. Chief Voss, Chief Smith and Detective Spahr testified that before giving his statement Smith answered affirmatively when asked whether or not he wished to give a voluntary statement. Court stenographer Ehrenbeck testified that no promises nor violence were used upon Smith to obtain a confession. When Prosecutor Calissi questioned the stenographer about the defendant's condition during the confession period, the stenographer replied, "The defendant appeared calm, spoke well. He spoke in a reasonably loud tone of voice."

When the confession was offered in evidence, the court withheld its ruling in order to give Smith's attorney time to examine the confession, as he had been unable previously to see it. Smith's attorney objected to the admission of the statement, claiming that it was not a confession but an admission.

After a colloquy between the court and counsel, Smith's attorney asked to have Smith sworn outside the presence of the jury in order to introduce evidence on the question of voluntariness. Whereupon, Smith testified that over a dozen men questioned him, that Galda was with him almost the entire time, and that the early morning of March 6th was very cold. He denied ever saying he would not go to the mound where the body was found; denied knowing the condition of the body when he confessed —even though it was shown prior to being picked up he had read that the victim's head had been crushed. Further, he claimed the police took samples of his hair by pulling it out by the roots. Basically, the petitioner attempted to show that he was not the murderer and that he had continuously lied to the police.

The Prosecutor called Louis M. Kalstad, who had been present in the courthouse on March 6th and who had been requested to go to the Prosecutor's office to witness the confession. He stated that when he observed Smith, Smith appeared all right; that he was smoking cigarettes one after the other and drinking coffee; and that he registered no complaints. According to Kalstad, when Smith was asked if he would give a voluntary statement, he said, "Let me think. Let's put it that way."

Captain DeMarco testified that no threats, force, nor compulsion had been used; that Smith had never been accused of the crime; and that Smith did not request a lie detector test and as a matter of fact refused to take one when given the choice. He further stated that Smith willingly told his interrogators where he had thrown a book and pocketbook of the victim, his own shoes, and his trousers, although the trousers were not found at that location.

The trial court ruled there was "no evidence of duress or persuasion, any inducement offered, any promises offered, no evidence of either physical or mental duress of any kind upon the defendant at the time the questioning took place * * * as far as I could see from the record everything was done for his convenience and comfort and every safeguard was taken that could be taken that he would not be under any duress, pressure, either mental or physical, and the statement was voluntary in the opinion of the court."

Upon examining the occurrences and events surrounding the confession we find nothing which leads us to believe that the police coerced relator Smith's confession. The police attempted to verify Smith's alibi on the night of the murder. There is no evidence that Smith requested counsel during his detainment. It is clear that as the interrogation continued it pointed closer and closer to Edgar Smith's implication.

Due to this, the police felt they would have to continue questioning Smith. Even though the intermittent questioning during the 13-hour and 20-minute detention period prior to confession must have tired Smith, we have to keep in mind that reasonable police interrogation is permissible conduct. The interrogation did not sap Smith's physical and mental resistance so as to overcome his free will. When Detective DeLisle obtained an acknowledgment of the confession from Smith, he had not utilized physical force or mental machinations in order to overbear petitioner's capacity for self-determination. We must remember at this point petitioner had an attorney and had been told not to sign anything. But Smith orally acknowledged the veracity of the statement DeLisle presented to him—the stenographer's transcript of the questions and answers constituting Smith's confession of March 6, 1957.

■ Petitioner alleges in the tenth category that the trial court abridged his constitutional safeguards as it failed to allow the jury to reconsider the voluntary nature of the confession after the trial judge had determined that it was voluntary. We find this argument to be without substance. At the time of the trial of petitioner Smith's case, the law of New Jersey was that the determination of voluntariness is for the court alone. State v. [Clarence] Smith, 32 N.J. 501, 546, 161 A.2d 520, 544 (1960). The United States Supreme Court has declared that the determination of the admissibility of a confession may be left to the trial judge or the jury, whatever is the local procedure. Rogers v. Richmond, 365 U.S. 534, 545, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

### III.
### ISSUES RAISED IN PART
### IN THE STATE COURTS.

#### Categories 11–12.

In the appeal from the trial court to the New Jersey Supreme Court, Categories 11 and 12 were raised in part. Because we have ruled that Edgar Smith has exhausted his available state remedies on the issues raised in the first appeal to the New Jersey Supreme Court, this court will examine the segments of points 11 and 12 that petitioner advanced before the New Jersey Supreme Court on appeal.

In the main, petitioner failed to present to the New Jersey courts the thrust of his eleventh point, namely, that the trial court failed to charge lawfully and properly on the petitioner's defenses. However, the New Jersey Supreme Court did consider a portion of this argument.

■ Edgar Smith claimed in his first appeal to the New Jersey Supreme Court that the trial court's charge was erroneous in that the charge removed from the consideration of the jury the question of reasonable doubt. Smith argued that reasonable doubt of his guilt would arise from consideration of evidence reflecting his claim of non-presence at the place and time of decedent's death. The New Jersey Supreme Court held otherwise,—ruling that the breadth of the charge allowed the jury to consider all the factors affecting the question of reasonable doubt. State v. Smith, 27 N.J. 433, 454–455, 142 A.2d 890, 902–903 (1958). The relator's petition lacks clarity as to the specific intrusion of his constitutional guarantees engendered by the alleged improper charge. However, it is immaterial, as we are in agreement with the New Jersey Supreme Court's disposition of this point.

We shall be unable to consider any other constitutional arguments put forth under petitioner's eleventh point. This is due to petitioner's failure to bring to the attention of the New Jersey courts any other arguments under this point. We must preclude ourselves from considering arguments on this point as there has not yet been such an exhaustion of state remedies as the policy of Section 2254 of Title 28 dictates.

■ The background of petitioner's twelfth point—the charge of the trial

court was erroneous in that the judge failed to charge all degrees of homicide including manslaughter—resembles petitioner's eleventh point. As with the eleventh point, the petitions did not fully argue his entire twelfth point before the New Jersey courts, but just maintained in his first appeal that the judge's charge distinguishing between first and second degree murder was harmfully defective. The New Jersey Supreme Court held that the trial court correctly charged the distinction between first and second degree murder. State v. Smith, 27 N.J. 433, 453–454, 142 A.2d 890, 901–902 (1958). Examination of the record shows that the New Jersey appellate courts have never considered whether the judge should have charged the jury on manslaughter.

It is difficult to glean from the relator's brief exactly how an allegedly incorrect charge on homicide in the instant case has infringed his constitutional safeguards. However, we agree with the New Jersey Supreme Court that the trial court's explanation of the difference between elements necessary to constitute second degree murder and first degree murder was correct. State v. Smith, 27 N.J. 433, 142 A.2d 890 (1958). Therefore, there was no impairment of petitioner's constitutional right to a fair trial.

We shall be unable to consider any alleged constitutional violations that the trial court committed in its failure to charge the jury on manslaughter. This is due to petitioner's failure to bring this issue to the attention of the New Jersey courts.

We have examined relator Smith's petition for habeas corpus with due care. He offers many points as alleged argument for granting the Great Writ. We have discussed those we feel merit discussion, and it is our conclusion that there is no basis for allowing affirmative relief.

An Order may be presented in conformity with the views hereinabove expressed.