**UNITED STATES of America ex rel. Edgar SMITH, Relator-Appellant,**

v.

**STATE OF NEW JERSEY and the Principal Keeper of the State Prison at Trenton, New Jersey, Respondents.**

No. 14104.

United States Court of Appeals Third Circuit.

Argued Feb. 19, 1963.

Decided July 24, 1963.

Rehearing Denied Sept. 9, 1963.

Stephen F. Lichtenstein, Trenton, N. J., for appellant.

William C. Brudnick, Asst. Prosecutor, Hackensack, N. J. (Guy W. Calissi, Bergen County Prosecutor, Hackensack, N. J., on the brief), for respondents.

Before McLAUGHLIN and GANEY, Circuit Judges, and COHEN, District Judge.

McLAUGHLIN, Circuit Judge.

In this appeal from denial of a petition for habeas corpus by a state prisoner the only question calling for any extended discussion is whether his confession was voluntary.

Appellant categorically states in his brief that his claims regarding the involuntary nature of his statement " * * * are not based upon the use of physical police brutality * * *." He was specifically asked on the witness stand regarding the period during which he gave his statement, "And you weren't mistreated at all during the day, were you?" He answered, "No, sir."

He was found guilty of murder in the first degree in the New Jersey state court. The crime was the wanton killing of a fifteen year old girl whom he knew. She was the daughter of a family living in the area where he had his home. Appellant was twenty-three years old at the time of the offense. He was married, living with his wife and their baby. He had served in the Armed Forces. He had been employed with Rayco Company.

There has never been any pretention that appellant was a child as in Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L. Ed.2d 325 (1962), rehearing denied, 370 U.S. 965, 82 S.Ct. 1579, 8 L.Ed.2d 835 (1962), or an adolescent as in Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L. Ed. 224 (1948), or an adult with the mental age of a child as in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). Actually, within two hours of Smith starting to tell his version of the occurrence he had been thoroughly examined by Dr. Gilady, the medical examiner for Bergen County (whose qualifications were admitted), who found him in normal health, alert, with pulse and respiration normal. These findings and their accurancy have never been disputed. Nor can the situation before us be argued as paralleling that in Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945) which turned on the avowed purpose of the police there concerned to extract a confession.

This appeal is zealously pursued. The theory of it is that a combination of secret inquisitorial process and psychological compulsion resulted in an involuntary confession. In connection with this, prompt arraignment, the right to be silent and the right to consult counsel, states appellant's brief, "all are closely connected to the period of interrogation to which a defendant legitimately may be subjected." It is rightly conceded that the rule of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), is applicable only to the federal courts. But states appellant this " * * * does not mean that the states are given the right to hold a suspect interminably or beyond a certain point." It is admitted that in Culombe v. Connecticut, supra 367 U.S. at 579–580, 81 S.Ct. at 1866, the sole decision on which appellant relies,[1]

---

1. Appellant also cites some language in the concurring opinion in Gallegos v. United States, supra. In that matter the de-
fendant was a fourteen year old child. His brothers, also involved, were aged twelve and eight.

clearly sets out the governing law where it states:

"But if it is once admitted that questioning of suspects is permissible, whatever reasonable means are needed to make the questioning effective must also be conceded to the police. Often prolongation of the interrogation period will be essential, so that a suspect's story can be checked and, if it proves untrue, he can be confronted with a lie; if true, released without charge."

With this rule in mind let us see of just what Smith's interrogation consisted, with particular attention as to whether it was coercive.

The girl was found brutally murdered around 9:20 A. M., March 5, 1957, in a deserted area known as "the sandpit" in the Township of Mahwah, Bergen County, New Jersey. That night at 11:30 the police took Smith into custody. The action of the police was based upon information supplied them by Joseph Gilroy, a friend of Smith's who had loaned his automobile to Smith the night before and had become suspicious of stains he found in it after receiving it back. On the night of the 5th, Smith went to bed at 7:00 P. M. At 7:30 his wife wanted to go to her mother's in Ridgewood. They went there. He went to bed at 9:30 and fell asleep almost right away. Smith was awakened by the officers and went with them to Mahwah police headquarters. The Prosecutor, Assistant Prosecutor Galda, Chief Smith of Mahwah, Captain DeMarco and numerous newspaper reporters were present. Mr. Galda did most of the questioning. Smith's left hand was lacerated. He said he had hurt it while repairing a tail pipe. He had a contusion on his left knee and a recent laceration on the right. Pictures were taken of those conditions. Smith explained he had become ill and fallen out of the car on his knees. He said he had become sick to his stomach and had vomited over his pants and shoes. He stated that he had thrown away the shoes and pants he had worn and that he would show them where. He went with Mr. Galda and three of the police to a

place in Ramsey where he had discarded his shoes. The stained shoes were obtained. The stains were later identified as blood. They drove to the sandpit next. Smith pointed to where he said he had been sick to his stomach. The police could not find any evidence of this. They went on to where Smith claimed he had left his pants but these could not be found. This was about 3:00 A. M. They returned to Mahwah. About 3:30 A. M. a detective picked up Smith's jacket which he had said he had worn the night before. There was some more questioning, particularly as to the clothes Smith had worn on the night of the 4th. For a time, while the police were talking between themselves, Smith sat in the back of the room with Gilroy and another person who was being questioned. Smith, after that, told the police that he had knelt on the shoes while his knees were bleeding, this in explanation of any blood that might be on the shoes. Coffee and buns were brought in for everyone, including Smith. Somewhere between 3:00 A. M. and 3:45 A. M. Smith went with the police to search for the places where he said he had been sick and where he had thrown his pants. Large hand floodlights were used and the whole area checked without success. The group returned to headquarters quite late. About 5:00 A. M. arrangements were made to have Smith examined with particular reference to his knees by Dr. Gilady. The examination was fixed for 7:30–8:00 A. M. On the way to the doctor's, a detective and Smith stopped at a lunch room and had breakfast. After that they picked up DeMarco and went to the doctor's office. The doctor found Smith to be in normal health. He was alert. His pulse and respiration were normal.

Following the examination, the party went to the Prosecutor's office where colored pictures were taken of Smith's knees and left hand. Around this time the Prosecutor's office was notified that the pants, stained with blood and with a pair of socks in a pocket, had been found. Smith's finger nails were scraped and cut and a pinch of hair was taken from his

left temple. He testified that he volunteered to take the latter out himself. He told the two detectives who were questioning him that the girl had hit him in the face. He started crying. He asked for some water and a cigarette which were given him. He asked to speak to a certain priest whom he knew and who was called. Shortly after that when Smith was more composed he told the detectives of meeting with the girl. The priest arrived forty-five minutes to an hour later and he and Smith were together about a half hour. After that, at 12:50 P. M., Smith agreed to make a voluntary statement. This was by questions and answers and Smith gave it under oath. It was taken stenographically, partly in the Prosecutor's office and later in the crime area. It is lengthy, covering 39 pages of the appendix. The statement was concluded at 3:45 P. M. and Smith was taken to Mahwah for arraignment, arriving there at 4:05 P. M. He was arraigned about seven o'clock that evening.

Smith's statement was given to a court reporter of whom the defense attorney said during the trial with reference to the statement, " * * * I am sure it is an accurate transcript because I know the stenographic reporter and I know his skills." The reporter was a trial witness. He said he took down everything that was said by Smith and those questioning him; that there were no threats or violence; that Smith did not complain at all. Throughout the taking of the statement a member of the general jury panel serving at that time, was present as a disinterested witness. He is an employee of the Curtiss-Wright Corporation. He observed Smith and his condition. He said "he seemed all right to me in every way" and that there were no complaints from Smith as to the manner in which he was being treated. Two township police chiefs, Captain DeMarco and Detective Spahr gave clear evidence pointing to the unhesitating willingness with which Smith answered the questions. These witnesses were not cross-examined at all with respect to the voluntariness of the

confession. The defense attorney, a most experienced, highly capable trial lawyer, conceded that the statement had been given voluntarily but was later rightly allowed to present evidence on the question of its voluntariness. Nowhere in the transcript of this two weeks' trial is there the slightest mention, reference or claim of coercion upon Smith in connection with his statement or otherwise.

Smith had said in his statement that after he swung hard, he didn't remember anything. In his testimony at the trial he said he had lied about that and other matters in his statement. The Prosecutor asked him: "Now the story that you told in the statement in the Prosecutor's office, S-84 in evidence, you told the same story to three other persons, is that right, three doctors, Dr. Spradley, Dr. Zigarelli and Dr. Collins?" Smith answered: "I don't know if I told them the exact story or not." Then he was asked: "But you told them substantially what you said to the Prosecutor's office?" Smith replied: "Substantially I did." It was immediately thereafter that he stated, "I was never handcuffed, no sir." And being asked: "And you weren't mistreated at all during the day, were you?", answered: "No, sir."

The total lapse of time Smith was in custody prior to his confession was thirteen hours and twenty minutes. Complaint is now made of this first, because of Smith's lack of sleep during the period. The night of the murder, he was in bed by 10:00 P. M. He listened to four rounds of the Gil Turner-Ruby Given prize fight. He said, "I laid in bed listening to Gil Turner knock him out in the fourth round and went to sleep." A round is of three minutes duration with one minute rest intervals. Three rounds and part of a fourth would not total fifteen minutes. The fight would take a few minutes to get under way. Reasonably it was over before 10:30 P. M. He got out of bed the next morning " * * * about 8:30." So he had apparently an excellent night's rest. The next evening he was in bed by seven o'clock. He rose a half hour later and took his wife and

814

baby to his mother-in-law's. He went to bed there and was in bed for two hours before the police woke him at 11:30 P. M. From that time through his arraignment there is nothing to indicate in Smith any condition of exhaustion or fatigue.

Some mention is made of Smith not having an outside jacket on while he going with the police to the various places connected with his story. He was out of doors altogether at most two or three hours. The longest he was out at one time was an hour. He wore a red woolen shirt. He had an undershirt on, for later he took it off and it was marked for identification. At one stage outdoors he mentioned it was quite cold and Mr. Galda gave him his overcoat which he wore from one-half to three-quarters of an .hour. The next morning, before he was taken to breakfast and to the doctor's, because he was cold, he was allowed to move into the front seat of the automobile in which he rode, as he says " * * * so that he (Detective Sinatra) could turn the heater on for me * * *." There is evidence indicating that the weather the night of March 5th was only two degrees colder than that of the night of March 4th. And while there is testimony that he had worn a blue jacket on the 4th, Smith also definitely said that all he had on that night was a shirt. This occurred on his cross-examination when he was asked to describe what the man who he claimed was at the sandpit, was wearing. He stated: "Dark trousers, light-colored shirt. Whether it was cotton, flannel, or what, I don't know."

Then came these questions and answers:

"Q. Well, it was pretty cold that night? A. It was.

"Q. And all he had on was a shirt? A. *That is all I had on.*

"Q. I didn't ask you that. A. Yes, sir.

*   *   *   *   *   *

"Q. * * * And it was a cold night though, wasn't it? A. *I didn't think it was too cold."* (Emphasis supplied)

Next, the impression is sought to be conveyed that Smith was not given enough food while in custody. He did not leave his mother-in-law's until after 11:30 P. M. March 5th. Somewhere around 3:00 A. M. when clearly for the first time anyone concerned was having something to eat and drink, i. e., buns and coffee, Smith was included. He had more coffee after that. And about 7:30 that morning or earlier he had his breakfast. His attorney asked him, "At one time during the statement they provided to you a glass of milk, did they not?" He answered, "I never got the glass of milk. * * * The statement was over before the milk was provided, and that was it." It is not contradicted that before starting his statement Smith was asked if he wanted " * * * some coffee or anything?" He asked for coffee and the answer was "Surely"; that when he was more than half way through his statement he was asked "Would you like some more coffee or *anything?"* (Emphasis supplied) which offer he did not accept; that a little while after that he was again asked "Would you like some coffee and rest up a few minutes—*something to eat?"* (Emphasis supplied). The offer of coffee and food was not accepted but that of a rest was and a short recess was taken. Right after the arraignment, Smith went to a restaurant with the Prosecutor where they had something to eat. Smith said "After I ate I felt fine."

It is self-evident from the record that appellant was never denied counsel; that he was never held in some sort of "secret inquisitorial process", subjected to "improper incommunicado questioning," to "gruelling and massive interrogation". The only person he expressed a desire of seeing was notified at once and did have a private talk with Smith.

It was not denied that Smith was asked if he would make a voluntary statement

under oath; that he assented to this and said:

"Can I ask a question here?

"Q. Surely. A. Like I explained to you before I am a little fuzzy on this. As I go along, can I add on—

"Q. Certainly, just as you know the incident as it actually occurred —and you can interrupt at any time you want. A. That is what I want to do—interrupt."

Smith was not expressly told that anything he said could be used against him. But he knew very well that it was the death of the girl he had been with which was being investigated. He also knew and saw demonstrated that every part of his account of where he had been and what he had done the night of the fourth would be objectively checked; that he was being given every opportunity and complete cooperation to vindicate himself of any suspicion of responsibility for the homicide.

It was while Smith was in the Prosecutor's office after pictures had been taken of his knees and left hand and his pants and socks had been found, that blood was found on his T shirt. Smith explained that by saying it was from a shaving cut. Examination did not bear this out. At that time Smith was being questioned by Detectives Spahr and de-Lisle. It was then that Smith broke out crying, asked for some water and a cigarette, which were furnished him, and to see the priest. After talking with the latter, as we have seen, he agreed to make a statement and did so. Following that he was brought to Mahwah to be arraigned. Throughout that thorough preliminary routine there is nothing in the record on which it can be legitimately premised that the investigatory custody of Smith was unduly prolonged. He never told the police that he killed the girl. He never took any conscious blame for her death. At the trial he stated under oath that he had lied respecting vital aspects of his statement. Particularly did he at the trial assert that the fault for the girl's death rested with a friend of his, saying also that he did not mention this

in his statement because he was afraid of retaliation from his friend.

There is another evidential item pressed as completing the alleged totality of circumstances which, it is urged, reveals Smith's statement to have been coerced. It is that the stenographer's caption to the transcript of the statement is titled "The State of New Jersey v. Edgar H. Smith, Defendant. Charge: Murder." It is uncontradicted that the first appearance of the written out statement was on March 11, 1957 when Detective deLisle took it to Smith. On that date Smith had already been indicted for murder. There is nothing in the evidence to show that the caption was given to the stenographer by the Prosecutor as is stated for appellant. There is nothing in the record to indicate that that statement was written up prior to the 11th. The taking of it was not concluded until 3:40 P. M. on March 6th. It, as said, covers 39 pages of the appendix. No contention is made or could be that the statement had been typed and was ready for use at the arraignment or indeed, prior to March 11th.

The undeniable factual situation resulting from the crime produced complications and time consuming essential detail that demanded proper attention. The authorities had a solemn responsibility to the dead girl, to Smith and any other possible suspect or suspects, to the community, to themselves. The individual personnel handling the matter distinctly shape up from the record as conscientious, experienced and competent. They were faced, inter alia, with the age old police problem of not prematurely charging a reputable citizen with a peculiarly dreadful capital offense where there were no eye witnesses and where the citizen protested his innocence and in corroboration thereof offered a detailed account of his activities throughout the critical period. The police were solely interested in obtaining the truth. They did not assume that Smith had killed the girl and then endeavor to justify that assumption: the investigation moved forward carefully on an impersonal unpreju-

diced basis. They uncovered every bit of evidence possible and scrutinized it all. They made certain that Smith was afforded every chance to furnish verification of his story. And they checked out every item of it firsthand. They were in no rush to accuse a married man with a wife and five months old baby of this horrible thing. Whatever Smith told them, which if true could help his assertion of innocence, they methodically and laboriously examined. In those initial phases they moved circumspectly as to everybody concerned; in particular, with respect to appellant, from all of the evidence, they acted soundly, with necessary deliberation and with due regard for his fundamental rights. Finally, when what he himself told them, taken in conjunction with such proofs as they had developed, warranted taking the irrevocable step of formally charging him with murder, that was promptly performed.

■ The record unmistakably reveals that Smith's statement was freely given; that it was not forced out of him by overbearing his will or by unduly prolonging the interrogation or by use of a secret inquisitorial process or by psychological compulsion or by massive questioning by relays of police or any other sort of wrongful questioning. Culombe v. Connecticut, supra; Thomas v. State of Arizona, 356 U.S. 390, 401, 78 S.Ct. 885, 2 L.Ed.2d 863 (1958). Nor, under the undisputed facts, was there undue delay in his arraignment. State v. Bunk, 4 N.J. 461, 471–472, 73 A.2d 249, 19 A. L.R.2d 1316 (1950), cert. den. 340 U.S. 839, 71 S.Ct. 25, 95 L.Ed. 615 (1950); State v. LaPierre, 39 N.J. 156, 171, 188 A.2d 10 (1963).

At the time of the trial of the indictment before us, it was the New Jersey practice for the trial court, sitting alone, to determine the question of whether a confession was voluntary. State v. (Clarence) Smith, 32 N.J. 501, 161 A.2d 520 (1960), cert. den. 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961). That rule was followed in the present instance. The admission of the confession was opposed

at the trial not on any allegation that it was involuntary but on the ground that it was not a confession. On appeal from the conviction that theory was abandoned and the argument presented was " * * that before he made the confession Smith had never been told of the nature of the injuries from which the victim died and that for this reason the inferences drawn from the confession are unjustified." State v. (Edgar) Smith, 27 N.J. 433, 457, 142 A.2d 890 (1958). The Court said 27 N.J. pp. 457–458, 142 A.2d p. 904, "Although we have difficulty conceiving the error upon which the defendant actually relies, we will treat the confession as though its introduction had been opposed upon every conceivable legal ground" and held that Smith's statement " * * * was a confession in which the defendant, at least in part, admitted committing the crime charged against him."

The Court said 27 N.J. at pp. 459–460, 142 A.2d at p. 905:

"Concededly it was voluntary, although the defendant at the trial said he had given untruthful answers.

"Whether a statement or confession is voluntary depends upon the facts in each case. The determination of the trial court will not as a rule be disturbed on appeal when there is sufficient evidence to support it."

In the district court in addition to urging that the confession was involuntary, the contention was made that "The judge did not allow the jury to reconsider the voluntary nature of the confession after he had determined that it was voluntary." United States, ex rel. Edgar Smith, Relator v. State of New Jersey, et al., 201 F. Supp. 272, 275 (1962). The Court rightly found that argument without substance citing the Clarence Smith opinion (supra) and Rogers v. Richmond, 365 U.S. 534, 545, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). That point is not pressed on this appeal.

The suggestion now put forth is that the trial judge did not hold the full pre-

liminary hearing respecting the confession that he should have.

There is no merit to this. As has already been stated, after it had been conceded that the statement was voluntary, that agreement was permitted to be withdrawn. Smith at that time took the stand out of the presence of the jury. He told what he did from the time he rose on the morning of March 5th until the taking of the statement. He was not cross-examined. The impartial juror was called by the state and he testified as has been noted. He was not cross-examined by the defense. The objection to the confession as argued to the court was that it was not a confession and should not be turned over to the jury.

The court said:

"On the question of voluntariness, the Court finds there is no evidence of duress or persuasion, any inducement offered, any promises offered, no evidence of either physical or mental duress of any kind upon the defendant at the time the questioning took place.

\*   \*   \*   \*   \*   \*

"I find his own relation of his apprehension and questioning—as far as I could see from the record everything was done for his convenience and comfort and every safeguard was taken that could be taken that he would not be under any duress, pressure, either mental or physical, and the statement was voluntary in the opinion of the Court."

On the propriety of it being considered a confession, the court referred to various parts of the statement and said:

"That in the opinion of the Court constitutes a direct acknowledgement of guilt on the part of the accused sufficient in both these instances as admissions of guilt to constitute this document, together with all the other relations in it in respect to the happening, as a confession and, therefore, S-84 for identification is admitted in evidence, as a confession."

It might be again noted that the court stenographer, two township police chiefs, Captain DeMarco and Detective Spahr all testified to the willingness of Smith to answer the questions asked him and that none of these witnesses was cross-examined as to that. In the course of the long trial the whole picture of what transpired while Smith was in custody prior to arraignment, was disclosed at length. If any doubt had arisen with relation to the voluntariness of the statement, the entire question of its admissibility could have been reopened. There was no such occasion.

It is very plain that the trial judge, under the governing law of New Jersey at that time, held an adequate preliminary hearing as to the voluntariness of the statement. It is also very plain that his decision that the statement was in the nature of a confession and that it was voluntary, was fully supported by the evidence.

Appellant also complains about the district court not passing on the issue which the court formulated to read "The State should produce the tape recording of a truth serum test that had been administered to petitioner." This was not raised as a point of appeal in either of appellant's state appeals. As appellee rightly observes, the application for a truth serum test was made by appellant's attorney prior to trial and a copy of the report was given him by his doctor. There was no trial use of the report. The request for production of the alleged tape recording was not made until after both appeals had been decided, No appeal was taken from the denial of that request. We agree with the district court that this issue was not before it.

The allegation which the district court interpreted to be, "A new trial was improperly denied" had no standing to be heard in that tribunal. We agree with the district court opinion, 201 F.Supp. 272, 275 (1962), that appellant's constitutional contentions re this allegation among others were not presented "\* \* \* in either his original appeal to

the New Jersey Supreme Court or in his motion for a new trial and its subsequent appeal. Moreover, an examination of the record reflects that the petitioner, Edgar Smith, has failed to take advantage of the New Jersey habeas corpus statute, N.J.S.A. 2A:67–1, wherein he might have offered argument on these eight points. Instead of exhausting his state remedies on these eight issues, petitioner has for the first time raised these issues for consideration in this court." See Section 2254, Title 28 U.S.C. The exact question dealt with a state court problem which was decided by the New Jersey Supreme Court on justifiable state grounds. State v. Smith, 29 N.J. 561, 578, 150 A.2d 769 (1959).

■ Finally appellant argues that introduction of the colored photographs of the victim's body denied Smith a fair trial. The admission of the pictures into evidence had been objected to for the reason that they had not been authenticated. The New Jersey Supreme Court disposed of the point purely on state reasons. It was never suggested at the trial or on appeal that their admission was a violation of appellant's due process rights. The appellate opinion expressly held that the logical relevance of these pictures was not overwhelmed by their inherently prejudicial qualities. State v. Wise, 19 N.J. 59, 115 A.2d 62 (1955); State v. Huff, 14 N.J. 240, 102 A.2d 8 (1954).

From our own study of the record in this appeal we are convinced that the district court's decision that it presents no basis for affirmative relief is fully justified.

The judgment of the district court will be affirmed.

GANEY, Circuit Judge (dissenting).

At the outset, while this Court should give due weight to the findings of the state court, it must be conceded that it has the unquestioned right to review the question of whether or not the confession here at issue was voluntary. Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029. It is stated in Lisenba v. California, 314 U.S. 219, 238, 62 S.Ct. 280, 290, 86 L.Ed. 166, "If the evidence bearing upon the question is uncontradicted, the application of the constitutional provision is unembarrassed by a finding or a verdict in a state court; even though, in ruling that the confession was admissible, the very tests were applied in the state court to which we resort to answer the constitutional question."

It is unnecessary here to recite the minutiae of detail concerning the events leading up to the police obtaining the confession of the appellant. Suffice it to say the stark facts are that from 8:00 a.m. on the morning of March 5, 1957, until 3:45 p.m. on March 6, 1957—almost thirty-two hours—the appellant had no sleep with the exception of a couple of hours before he was taken from his bed and placed in custody at 11:30 p.m. on March 5th; that he was interrogated in relays by prosecutors and their aides, local police and county detectives, as many as seven being present at one time, all through the night, relieved only by his being taken to various places in freezing weather with only a T-shirt on, to check his alibis; that he was given a light breakfast, stripped and examined by a doctor and questioned again repeatedly until 10:00 a.m. on March 6th, when he broke down completely and cried and asked for a Catholic priest. At this hour, the police had in their possession, as a result of their investigation, the car that the appellant used the night of the crime, in which was a blood-stained mat, his shoes and socks, all stained with blood, and an admission from him that he was at the scene of the crime with the decedent and had given her "a good shot." From this point on, there was no need of any more exploratory or investigative work, nor, in fact, was any made, and by every standard of fairness, the appellant should have been arraigned. However, neither advising him that he had the right to remain silent nor that he had the right to counsel, they proceeded for two hours to extract a statement from him of the details of the crime and, from his own lips, to brand himself with guilt. An ex-

amination of the record discloses no reason or motive whatsoever consonant with recognized police work for the detection of crime in the securance of the confession except, as adverted to, to compel admission of his guilt.

There cannot be the least doubt of the right of the police to question or interrogate an individual in custody suspected of a crime and the police may not be thwarted in this procedure even where the person was denied the right to communicate with or have counsel present during the interrogation. Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L. Ed.2d 1448. Indeed, the Supreme Court of New Jersey, speaking in State of New Jersey v. Smith and Stanford, 32 N.J. 501, 161 A.2d 520, 537, said, "While police brawn and bluster to extort confessions cannot be a substitute for brains and leg work and will not be countenanced, the public interest requires that interrogation, and that at a police station, not completely be forbidden, so long as it is conducted fairly, reasonably, within proper limits and with full regard to the rights of those being questioned." This right, the Court continued, has always been the rule in the State of New Jersey, citing numerous authorities. However, while this right of interrogation cannot be denied, it is always with the purpose of determining the degree, if any, of the participation of the individual in the crime sought to be solved.

It is submitted the true rule is stated in Culombe v. Connecticut, 367 U.S. 568, 581–582, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037. "Its essence is the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips. See Blackburn v. Alabama, 361 U.S. 199, 206–207 [, 80 S.Ct. 274, 4 L.Ed. 2d 242]; Chambers v. Florida, 309 U.S. 227, 235–238 [, 60 S.Ct. 472, 84 L.Ed. 716]." Here, the confession was obtained—as distinct from interrogation—from an over-weary, distraught mind after hours of questioning solely for the purpose of convicting him. If corroboration for this is necessary, it is found five days later. While still in jail, a detective came to his cell and asked appellant to sign the confession which he had already given, thirty-nine pages in length, and he refused to so do, telling him that his counsel had advised him not to. However, unwary of the law, upon being asked to read it and having done so, the detective drew from him an admission of its correctness. Here was the final stamp of approval and the State had him convicted out of his own mouth for, under the law of New Jersey, it is unnecessary that a person sign a confession to make it valid, but merely that he read it and acknowledge the same. Nor is this subtle, coercive conduct mitigated by the earlier affirmative answer to the police suggestion that he was being fairly treated.

It is my considered judgment that to take this undue advantage of a youth and one unlearned in the law, in spite of his informing the detective of his counsel's advice, is a shabby piece of police work this Court should not lend sanction to, or permit to go unchallenged.

Here, in the totality of the circumstances, every sense of the fair and ordered concepts of justice inherent in the right of an accused person under the Due Process Clause of the Constitution was offended by the securance of this confession. Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed. 2d 1265.

I would reverse the judgment of the district court and remand the case for issuance of a writ of habeas corpus which, in no wise, precludes a new trial or the taking of unnecessary steps to hold the appellant in custody pending such new trial. United States ex rel. Thompson v. Dye, 3 Cir., 221 F.2d 763.