STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ROBERT LaPIERRE, FRANK BISIGNANO AND ANTHONY RUSSO, DEFENDANTS-APPELLANTS.

Argued May 21, 1962—Reargued October 9, 1962—Decided January 21, 1963.

*Mr. Brendan T. Byrne,* Essex County Prosecutor, argued the cause for plaintiff-respondent (*Mr. Angelo R. Bianchi, Mr. Peler Murray,* and *Miss June Strelecki,* Assistant Prosecutors, of counsel and on the brief).

*Mr. Samuel A. Larner* argued the cause for defendant-appellant Bisignano; *Mr. Robert L. Clifford* argued the cause for defendant-appellant Russo (*Mr. Joseph A. Clarken, Jr.,* on the brief) ; *Mr. Anthony A. Calandra* argued the cause for defendant-appellant LaPierre.

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendants were convicted of murder in the first degree. Bisignano and Russo were sentenced to die. LaPierre was sentenced to life imprisonment pursuant to the jury's recommendation. All appeal directly to this court. *R. R.* 1:2–1(c).

The jury could readily find the following facts. At about 11 P. M. on March 15, 1961 Russo and Bisignano entered Hahn's Tavern in Newark, wearing dark coats, dark hats and dark glasses, Russo holding an automatic and Bisignano a knife in a position to suggest it was a gun. Advancing toward a group at the bar, Russo announced a holdup and brandished his weapon. Joseph Hagel, a police officer then off duty, drew his revolver. Shots were exchanged. Both men were wounded, Hagel fatally.

Bisignano took off upon the opening shots. Russo followed, but fell at the door, losing his hat, glasses and gun. LaPierre, who was in the "getaway" car defendants had stolen earlier that evening, left the vehicle to flee on foot. As he did, his head struck the door, and the dark glasses he too was wearing fell to the street where they were later found. Russo called to LaPierre for help. LaPierre responded, and the two pursued a frantic course through back yards, with Russo stumbling about in the apparent belief that he had multiple and grievous wounds, whereas in fact he had been hit but once, in his right arm.

As the police closed in, LaPierre surrendered. Russo managed to continue a short distance before being picked up and placed in the patrol wagon which already held LaPierre. Upon learning that Russo was wounded, the officers took him to the city hospital where he was held under guard.

Meanwhile Bisignano was busy preparing an alibi. He picked up Russo's girl friend, Veronica S., at the apartment where she and Russo were living and took her to his home in Lodi. There Bisignano, his wife and Veronica rehearsed a story concerning his whereabouts at the time of the holdup. During the night the radio reported the death of the victim and that LaPierre and Russo were in custody. In the morning Bisignano and Veronica returned to her apartment where they were met by police officers.

There was no serious issue as to guilt despite testimony designed to dispute it. Russo spoke unconvincingly of drink and drugs, and that he entered the tavern only to "case" it for a friend. LaPierre testified he told his codefendants just before they left the car that he was not to be included in this robbery. Bisignano too claimed he abandoned the plan, saying in his confession that he asked Russo to call it off after they entered the tavern, while at the trial he said he communicated his withdrawal when still on the sidewalk and went into the tavern with Russo for some beer. The jury understandably was not impressed with these stock stories.

## I.

All defendants signed confessions. LaPierre, who confessed first, did not question the voluntariness of his statement, but Bisignano and Russo asserted they yielded to force and threats.

## A.

We must first consider a procedural problem.

In *State v. Smith,* 32 *N. J.* 501, 557 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961), we held (1) the trial judge must make his own finding upon the issue of voluntariness; and (2) if he finds the statement to be voluntary and hence admissible, he must instruct the jury to consider the same issue and to *disregard* the confession

unless it finds the State has proved it was voluntarily obtained. We thus departed from prior practice only in this respect — that whereas theretofore the jury was told that it could consider the circumstances surrounding the confession to decide whether to *believe* it, henceforth the jury was to be instructed to *disregard* the statement completely unless it is found to be voluntary.

The trial court was aware of *Smith* and referred to it, and when the trial court admitted the confessions, counsel did not suggest the court had failed to discharge its role. However, in their briefs on appeal they urged for the first time that the trial court did not make its own finding of voluntariness but rather decided only that the proofs raised an issue of fact which the jury, and only the jury, must decide. In other words, defendants contended the trial court had not performed the first step described above in our summary of *Smith*.

The State thereupon moved before us for a remand for certification by the trial court as to whether it had in fact found the confessions voluntary before admitting them into evidence. The record seemed ambiguous. It was consistent with defendants' criticism but was also consistent with the proposition that the trial judge implicitly found the confessions voluntary and referred to a triable issue of fact simply to indicate that he would later submit the same issue to the jury in accordance with *Smith*. The fact that none of the counsel raised the issue at the trial suggested that in the context of what had preceded it, the court's ruling carried that implicit finding. In these circumstances we granted the State's motion. In response, the trial court certified it had in fact found the confessions voluntary before receiving them into evidence.

Later we directed the trial court to furnish detailed findings in support of its general finding of voluntariness. The trial court returned such subordinate findings.

We then directed reargument of the issue of voluntariness in the light of those further findings and also invited defend-

ants to advance any objection they had to the use of the trial court's certification and additional fact findings to which we have just referred. In response defendants argued it is unfair and indeed a denial of due process of law to consider the post-trial expressions of the trial court.

With respect to the trial judge's certification that he found the confessions voluntary before admitting them into evidence, defendants urge (with no reflection upon this trial judge) that it is better to deal solely with the record as originally returned because not every judge can be expected to certify his own error. But the answer is that we must assume that every judge can and will, that he places truth above pride, and will shun the burden of conscious wrong. The judicial process depends upon that faith. So it has been the traditional role of the trial judge to certify the record upon which the claim that he erred will be tested upon appeal. See *Miller v. United States,* 317 *U. S.* 192, 63 *S. Ct.* 187, 87 *L. Ed.* 179 (1942). Our present rules so provide. *R. R.* 1:6–2, 3, and 6.

Hence here, the record being unclear as to whether the trial court misconceived its duty under *Smith,* it was consonant with established practice and with fundamental fairness to call upon the trial court for clarification. See *R. R.* 1:4–1 and *R. R.* 1:6–6. The latter rule expressly provides that "if any difference arises as to whether the record truly discloses what occurred in the court below, the difference shall be submitted to and settled by that court and the record made to conform to the truth." *Cf. Slaughter v. United States,* 84 *U. S. App. D. C.* 232, 172 *F. 2d* 281 (*D. C. Cir.* 1949), *cert.* denied 338 *U. S.* 874, 70 *S. Ct.* 135, 94 *L. Ed.* 536 (1949); *Merchant v. State,* 217 *Md.* 61, 141 *A. 2d* 487 (*Ct. App.* 1958); *Clark v. State,* 119 *Ohio St.* 162, 162 *N. E.* 429 (*Sup. Ct.* 1928).

We do not suggest a new trial would have to be ordered if a trial court failed to make its own finding. If, as here, the issue of voluntariness was given to the jury with instructions to disregard the confession unless it is found to be vol-

untary, the demand of federal due process would be met. *Stein v. People of State of New York,* 346 *U. S.* 156, 73 *S. Ct.* 1077, 97 *L. Ed.* 1522 (1953). What then would remain is the question whether the additional protection we intended for the accused in *Smith* could be afforded by our own finding upon the issue of voluntariness. At the moment we see no reason why it could not, but since the question need not be decided, we leave it open.

The remaining procedural issue is whether we should consider the detailed factual findings supplied by the trial judge pursuant to our directions.

Usually a trial judge states only a finding of the ultimate fact that the confession was voluntarily given. Where the issue has but a single facet, let us say, the use or threat of force, the trial judge's abbreviated finding tells the reviewing court all it need know to discharge the appellate obligation to give full regard to the opportunity of the trial court to judge the credibility of the witnesses. *State v. Smith, supra* (32 *N. J.,* at *p.* 549). Where, however, the issue involves a number of ingredient claims, a finding upon each would assist the reviewing court, see *State v. Fauntleroy,* 36 *N. J.* 379, 397 (1962), for the trial court could have held for the State notwithstanding a finding for defendant upon one of the ingredients, whereas the reviewing court might conclude the defendant should prevail because of the single fact so found for him. Hence a trial judge should make findings in such detail as he believes necessary to assist an appellate court in the event of an appeal.

We, however, have no rule of court requiring the trial judge to detail his findings upon the issue of voluntariness. Even in a trial of a criminal case without a jury, the judge is directed to make subsidiary findings only upon request. *R. R.* 3 :7–1 (c) provides that in such matters the court "shall make a general finding and shall, in addition, on request, find the facts specially." See *R. R.* 8 :7–2 (c) which also so provides with respect to penal matters tried in the municipal court.

On the civil side, *R. R.* 4:53–1 provides that a judge sitting without a jury "shall find the facts specially and state separately its conclusions of law thereon." Nonetheless, appellate review is not limited to the factual findings made before the entry of judgment, for *R. R.* 1:2–8(h) provides that within 10 days from service of a notice of appeal the trial judge "may file and transmit to the parties a written opinion stating his findings of fact and conclusions of law, or an amplification of any prior statement, opinion or memorandum filed pursuant to Rule 4:53–1."

▮ Ideally, the underlying facts should be found before the ultimate decision is stated, since in some cases that process might lead the judge away from the gross impression with which he started the statement of his decision. See *Franzoni v. Franzoni,* 60 *N. J. Super.* 519, 522 (*App. Div.* 1960) ; *State v. Sullivan,* 24 *N. J.* 18, 45–46 (1957) (dissenting opinion). Such situations, however, are quite exceptional and the present case is not one of them. At any rate, fairness does not require retrials in every case in which a trial court failed to state the subsidiary findings at the time of trial. On the contrary it would be the unusual case in which justice would demand that course. Ordinarily, it is sufficient for the reviewing court to exercise its power in non-jury cases to make original findings of fact, *R. R.* 1:5–4(b), or, if it deems it desirable, to remand the matter to the trial court for preparation of the findings of fact. The power to remand to that end is well supported by precedent. *Ford Motor Co. v. National Labor Relations Board,* 305 *U. S.* 364, 59 *S. Ct.* 301, 373, 83 *L. Ed.* 221, 229 (1939) ; *Franzoni v. Franzoni, supra* (60 *N. J. Super.,* at *p.* 523) ; 5 *Moore's Federal Practice* (*2d ed.* 1951), § 52.06, *p.* 2662. Usually the occasions to remand for findings arise in civil causes but we see no reason to abjure that course in a criminal case with respect to a court issue. *Cf. United States ex rel. Alvarez v. Murphy,* 265 *F. 2d* 497 (2 *Cir.* 1959).

B.

We come to the question whether the trial court properly found the confessions of Bisignano and Russo were voluntary.

In broad outline, defendants claimed duress by police officers and in support emphasized that the deceased was a brother officer. The State on the other hand contended defendants knew they were caught and hence admitted what they could not avoid. Thus, with Russo and LaPierre in custody, Bisignano believed the trail would likely lead to him, and in anticipation of police interrogation he arranged an alibi with his wife and Russo's girl friend. When LaPierre implicated him, Bisignano knew the game was over, and even before his written statement was started, he sent his wife a note, "Forget about what I said, tell them the truth, I admitted what I did." And as to Russo, his arm held a bullet from Hagel's gun and he was so aware of the story it could tell that he refused to consent to surgery until the pain became more than he could bear. With the State in possession of the bullet (it had shattered, but this Russo did not know), the confessions of LaPierre and Bisignano, and the statement of his girl friend, Russo knew he was fully identified with the event by the time he was taken to headquarters for questioning.

The issue of course is the voluntariness of the confessions rather than their truth, and the State refers to the enmeshing evidence which defendants knew the State held, only to support its thesis that defendants confessed because they were trapped rather than because of force, threat, or other impropriety.

Both defendants had prior experience with the law. Bisignano, age 22, was on parole under a conviction for grand larceny. Russo, age 21, was awaiting sentence for armed robbery.

The interrogation of Bisignano began about 11:45 A. M. on March 16. By 3:15 P. M. he had already admitted his

guilt orally and written the note to his wife, quoted above. In the meantime LaPierre had confessed and retraced his and Russo's flight from the scene, leading to the recovery of some tangible evidence. The typed statements of Bisignano and LaPierre were prepared simultaneously, commencing at about 3:15 P. M. The preparation consumed some three hours. Thus the time interval between the onset of interrogation and the confession was not extensive.

Counsel for Bisignano stresses his testimony that he received no food until about 6 P. M., but Bisignano did not say that he asked for food or indeed that he wanted any before that time. In short, he nowhere suggested that he felt deprived of sustenance or yielded on that account. It is fair to assume that, with his alibi destroyed, Bisignano was not terribly interested in lunch. Indeed he was quite upset. He wept, and according to LaPierre he cried, "What am I doing here?" which to us reveals a rueful reaction upon comprehending a deep involvement. And we place no credence in Bisignano's testimony that he was denied his request to see his wife and threatened with her arrest if he did not confess. Rather we infer that having made his wife party to an alibi story he knew could no longer stand, he was anxious not to involve her in illegality, and to that end he sent her the note we mentioned above, penned before the preparation of the written confession.

Indeed Bisignano categorically attributed the confession solely to the alleged beating, and the voluntariness of the confession really depends upon that claim. According to him the officers pounded him savagely with hose, fists, and feet, without so much as a single question about the case. The officers denied force or threat of force.

In support, defendant refers to the testimony of members of his family that when they visited him the next day and touched sundry parts of his body, he recoiled in pain; that Veronica testified she saw black and blue marks on the forehead at the hairline; that two inmates at the jail testified

that when they saw defendant undressed, they observed numerous bruises and welts.

It seems to us that the testimony is outweighed by other facts and circumstances. It is unlikely the police would have permitted defendant to see his family so soon after the ferocious beating which he described, and equally unlikely that defendant's family would not have complained to someone in authority. Moreover, when defendant was before a magistrate on March 20, he said nothing, and when he reached the county jail he executed a medical questionnaire in which he disavowed any sickness or complaints. And although it was argued that the warden intentionally kept defendant off sick call so that no doctor would see him, defendant on cross-examination said his sole complaint to any official was of pain over the left eye, for which he was appropriately given aspirin.

We need hardly note that none of defendant's witnesses was an impartial observer. The family's interest is evident. Although LaPierre had implicated defendants, he was willing, and perhaps on that account anxious, to help them whenever he could. Indeed, it seems to us that in their testimony all defendants sought thus to aid each other. Veronica of course was interested in Russo who also claimed his confession was involuntary. And as to the inmates at the county jail, we need not speculate upon their motivation to discount their testimony.

The issue turns upon the credibility of witnesses. The trial judge who saw and heard them found the State had carried its burden of proof. We agree.

Russo signed his confession on March 24, nine days after the killing. He did not claim he was beaten at that time, although he charged a threat to drop a typewriter on his wounded arm. He did, however, charge physical abuse days before. Specifically he claimed (1) a policeman punched him in the abdomen as he was taken from the van at the hospital the night of the killing, (2) that early the next morning a detective struck him on the left cheek, and (3)

after surgical removal of the bullet a detective rapped his injured arm with his knuckle, causing welts. The emphasis was upon the last two items, as to which defendant claimed support in the hospital records. Police officers denied all of these charges.

As to the alleged blow to the cheek, defendant pointed to the nurse's entry at 3 A. M. on March 16:

"Oral Hygiene. Patient's mouth cut (?), expectorating blood tinged secretion. Complained of left mandible pain. Edema of area and left side of mouth noted."

In claiming this entry supports his charge, defendant stressed the testimony of the officers in which they estimated the time of their visit as having been short of 3 A. M. We note, however, that the nurse's entry shows the officers visited defendant *after* the 3 A. M. observation. At any rate, we are satisfied the injury was not thus inflicted. There was ample opportunity for injury elsewhere. Defendant testified to a struggle with the deceased. He fell at the door of the tavern losing his hat and glasses, and was unsteady during his flight from the scene. We think it of no significance that an injury to the face was not recorded upon defendant's admission to the hospital. Defendant and the doctor were then preoccupied with the bullet wound. Moreover the nurse who made the entry testified that at 3 A. M. "his face had become increasingly swollen" and at that time "it was more visible than when he was admitted," thus negating that the injury was a fresh one caused by force applied after admittance.

As to the arm, the chart has an entry on March 21, "Large welts noted on rt forearm—this was reported to Dr. Donato." There is, however, no reason to say the welts must confirm the claim of abuse. They could have ensued from surgical or postsurgical procedures. We note that when Dr. Donato appeared for the State in another connection, the defense announced it would call him later but did not.

Thus defendant sought to rely on naked entries in the hospital record without medical testimony concerning the likeli-

hood of a connection with the alleged abuse. Defendant stresses the State's failure to adduce such testimony to negate a connection, notwithstanding its officers did deny that Russo was struck. We see no call upon the State for that further proof. Significantly, the hospital record nowhere reveals a claim of maltreatment. Nor did defendant testify that he complained to any member of the hospital staff.

The trial court found there was no force or threat of force, and we share that view.

## C.

Both defendants protest the failure to take them "without unnecessary delay, before the nearest available magistrate," in compliance with *R. R.* 3 :2–3 (a), and urge such failure should itself vitiate the confessions. Actually the time interval between the onset of custody and the confession was quite brief in the case of Bisignano, and equally brief in the case of Russo if the period of hospitalization is deducted. At any rate, we have repeatedly declined to follow the lead of *McNabb v. United States,* 318 *U. S.* 332, 63 *S. Ct.* 608, 87 *L. Ed.* 819 (1943), and *Mallory v. United States,* 354 *U. S.* 449, 77 *S. Ct.* 1356, 1 *L. Ed. 2d* 1479 (1957). See *State v. Smith, supra* (32 *N. J.,* at *pp.* 544–545); *State v. Wise,* 19 *N. J.* 59, 84 (1955); *State v. Pierce,* 4 *N. J.* 252, 263 (1950). We find nothing in *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 (1961), which suggests the federal doctrine of exclusion for delay in arraignment is of constitutional stature and applicable to the States. It remains an exercise of the supervisory authority of the United States Supreme Court in the administration of justice in the federal courts. See *Culombe v. Connecticut,* 367 *U. S.* 568, 599–600, 81 *S. Ct.* 1860, 6 *L. Ed. 2d* 1037, 1055–1056 (1961).

## D.

Bisignano asked the trial court to try the issue of voluntariness in the absence of the jury. No reason was ad-

vanced for that course, defendant simply contending the jury had to be excused.

There is disagreement elsewhere as to the propriety of taking the testimony initially in the presence of the jury. See Meltzer, "Involuntary Confessions: The Allocation of Responsibility between Judge and Jury," 21 *U. Chi. L. Rev.* 317, 330 (1954); Annotation 148 *A. L. R.* 546 (1944). The differences may well be influenced by the roles ascribed to judge and jury in the several jurisdictions. We have but recently reiterated that the subject rests in the sound discretion of the trial court. *State v. Walker,* 33 *N. J.* 580, 592 (1960). We are not dissuaded from that view by the argument here advanced, that a judge may be influenced to admit a confession because, if it is excluded after testimony is taken in the jury's presence, there will likely be a defense motion for a mistrial.

The question then is whether the trial court misused its discretion. We think it did not. Defendant did not point to a fair need to excuse the jury either throughout or during some stage of the hearing. Nor does it appear that the inquiry was in fact hampered by the jury's presence; and since the confession was later admitted into evidence, it was not harmful that the jury probably surmised at once the nature of the document in question.

## II.

Before the selection of the jurors was completed, a juror who had been accepted asked to see the trial judge. He saw her privately and learned that she was troubled as to whether her status as an ordained deacon was compatible with jury service in a case in which the death penalty was sought. She was questioned further by counsel in open court and was then excused for cause. Bisignano and Russo contend their motion for a mistrial should have been granted.

The complaints are several: (1) the trial court had a private conference with the juror; (2) the court returned

the juror to the jury room, thus infecting the other jurors; and (3) there is no authority to reopen the *voir dire* after a juror has been accepted.

Ordinarily a judge should not interrogate a juror in the absence of counsel, *Wright v. Bernstein,* 23 *N. J.* 284, 297 (1957), but this does not mean that he may not, at the juror's request, ascertain what is troubling the juror. That apparently is what happened here, and having learned of the juror's problem, the court informed counsel of it. We see no irregularity, nor any violation of a defendant's right to be present. The further examination of the juror occurred in open court, and the court's determination was based upon what there transpired.

Nor was there any irregularity in permitting the juror, pending her further examination, to remain with the other jurors who had been selected. There is no reason to speculate that some harm could somehow have ensued.

And finally a trial court has the discretionary power, before evidence is presented in the trial, to reopen the examination of a juror already sworn and excuse the juror for cause. *R. R.* 3:7-2(b); see *State v. Rios,* 17 *N. J.* 572, 593-594 (1955). And we need not stop to consider whether "good cause" existed for excusing the juror. No right of defendant could thereby be invaded. His right is to impartial jurors rather than to a particular juror. *State v. Deliso,* 75 *N. J. L.* 808, 811 *(E. & A.* 1908); *State v. Langhans,* 95 *N. J. L.* 213, 216-217 *(E. & A.* 1920); see *Wright v. Bernstein, supra,* 23 *N. J.,* at *pp.* 293-294.

## III.

Finally Bisignano contends (A) the State failed to prove the crime charged as "limited by the bill of particulars," and (B) the verdict was against the weight of the evidence.

## A.

The indictment, in accordance with the rules, charged defendants "did willfully, feloniously and of their

malice aforethought kill and murder Joseph Hagel." *R. R.* 3:4–3(b). Bisignano demanded particulars, in response to which the State said the killing was "a felony murder, specifically a murder in the course of a robbery." The complaint is that the State proved only an *attempt* to rob, since it did not prove that anything was taken. While acknowledging that a killing in an attempt to rob is equally murder in the first degree, defendant nonetheless claims a fatal variance.

It is perfectly obvious that defendant was not misled. The examination of the prospective jurors reveals that all defendants knew precisely what was involved.

### B.

The evidence overwhelmingly supports the jury's verdict. The robbery was planned. A gun was obtained and a getaway car stolen by way of preparation. Defendants in dark clothes and dark glasses went in search of a place to hold up. Bisignano as well as Russo looked over the tavern in question, and both entered in a manner which evidenced a purpose to carry out the design.

In essence Bisignano says the jury should have credited his testimony that he withdrew from the plan just before he and Russo entered the tavern and that he went in with Russo just to obtain some beer. The jury could readily find the claimed withdrawal was just a myth.

### IV.

We proceed to the further points made by defendant Russo.

### A.

The first is that the trial court improperly limited evidence offered as to "his capacity to form the requisite intent" for the felony murder and also upon the issue of punishment.

Russo produced a clinical psychologist, a neurologist, and two psychiatrists. The neurologist (who also is a psychia-

trist) testified that there is no evidence of organic injury or disease. The other experts testified in sum total that Russo is within the average intelligence range although at the lower reaches of it; that he is deficient in abstract thinking; that he is not psychotic or psychopathic but does act impulsively, with hostility and violence, unmindful of tomorrow and consequences. The witnesses were permitted to relate at length the history received from Russo, which included his early home life marred by the brutality of a drunken father, to account for the pattern of man they found.

Only one witness was questioned in terms of the rule of legal insanity which prevails in our jurisdiction. *State v. Lucas,* 30 *N. J.* 37 (1959). Asked whether defendant "was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing or if he did know it that he did not know what he was doing was wrong," the witness said defendant was unable "to conceive of what he does in terms of anything but immediacy, that it's very difficult for me at this time to say yes or no, that he did or did not know that what he was doing was wrong." We find nothing in the remainder of the witness's testimony that would have suggested legal insanity.

Indeed we do not understand that defendant contends he was insane. Rather he argues the trial court barred expert testimony designed to show he did not have the capacity to form an intent to rob. But nothing in what was proved or offered even remotely suggested Russo lacked that capacity or that any expert could aid the jury in deciding whether Russo entered the tavern with the intent to rob.

What the trial court rejected was something quite different, to wit, an effort to obtain answers to hypothetical questions keyed to a standard of criminal responsibility which we do not recognize. Specifically, the questions were framed upon the test of insanity projected in *United States v. Currens,* 290 *F. 2d* 751, 774–775 (3 *Cir.* 1961), *i. e.,* whether because of mental disease or defect defendant lacked substantial capacity to conform to the requirements of the law he is alleged

to have violated. It is far from evident that any of the witnesses even found a mental disease or defect within the meaning of that rule, but at any rate the trial court properly sustained the State's objection on the larger ground that opinions thus sought were irrelevant.

Defendant contends that even though the evidence may not be pertinent to the issue of guilt in the light of our decision in *Lucas, supra,* yet the opinions should have been received upon the question of punishment. He refers to *State v. DiPaolo,* 34 *N. J.* 279, 291 (1961), in which we held the jury may be given the full psychiatric picture, unfettered by any concept of insanity, so that in deciding upon punishment the jurors may know what kind of man stands before them and why he is as he is. The trial court here accepted such proof without limit, including the history upon which the experts based their descriptions and estimates. The jury thus received what we think it should have. To go further and permit hypothetical inquiries geared to tests of legal insanity which we have rejected would invite confusion upon the issue of guilt.

## B.

One of the State's witnesses testified that the first shots were followed by louder ones. The prosecutor argued in summation that since Hagel's gun was of .38 caliber and Russo's .32 caliber, the jury could infer that Russo fired first. Whether Russo did was irrelevant upon the issue of guilt, but defendant says it could bear upon punishment and hence he presses his objection that the prosecutor commented upon matters not in evidence. We think the prosecutor did nothing more than argue for an inference from facts in the record. We think the inference he suggested could well be drawn, but if it should not, still there is no impropriety in contending for it. 6 *Wigmore, Evidence* (3d ed. 1940) § 1807, *p.* 272.

## C.

Russo demanded bills of particulars, some of which were denied, and of this he complains.

*R. R.* 3:4–6 provides for a bill of particulars "when the indictment or accusation is not sufficiently specific to enable the defendant to prepare his defense." Actually the demands here made did not seek greater specificity as to the offense charged in the indictment, *cf. State v. Sullivan*, 33 *N. J. Super.* 138 (*App. Div.* 1954), except perhaps one which, defendant says, was intended to reveal whether the killing was claimed to have occurred during a robbery or during an *attempt* to rob, a subject to which we referred earlier in this opinion. Rather what defendant sought by his demands was pretrial discovery as to evidence and sources of evidence.

We think it sufficient to say that upon a post-conviction review of a denial of discovery, prejudice in fact must appear, and since we find none, it would be quite academic to canvass the subject.

## D.

Finally Russo charges error in the denial of his motion for a change of venue, a foreign jury, or adjournment of the trial date. The motion was based upon newspaper accounts about the crime and the defendants. The trial court found no incompatibility with the prospect of a fair trial.

The *voir dire* of the jurors revealed that some had read of the murder, but impartial jurors were nonetheless selected, and in fact Russo did not exhaust his peremptory challenges. We are satisfied the trial court did not misuse its discretion in denying the motion. *State v. Wise*, 19 *N. J.* 59 (1955); *State v. Collins*, 2 *N. J.* 406, 411 (1949).

## V.

Finally, we come to the grounds advanced by defendant LaPierre.

## A.

 LaPierre being 17 years of age at the time of the offense, a hearing was held by the Juvenile and Domestic Relations Court to determine whether the complaint should be referred to the prosecutor under *N. J. S.* 2A:4–15 which reads:

"If it shall appear to the satisfaction of the juvenile and domestic relations court that a case of juvenile delinquency as defined in *section* 2A:4–14 of this title committed by any juvenile of the age of 16 or 17 years, should not be dealt with by the court, either because of the fact that the person is an habitual offender, or has been charged with an offense of a heinous nature, under circumstances which may require the imposition of a sentence rather than the disposition permitted by this chapter for the welfare of society, then the court may refer such case to the county prosecutor of the county wherein the court is situate.

Any juvenile of the age of 16 or 17 years may demand a presentment and trial by jury and, in such case, when this fact is made known to the court, such case, together with all documents pertaining thereto, shall be referred to the county prosecutor.

Cases so referred to the county prosecutor shall thereafter be dealt with in exactly the same manner as a criminal case."

The court referred the matter to the prosecutor upon finding that the offense as charged was of such a heinous nature that for the protection of society the matter should be handled as an adult criminal offense.

LaPierre did not seek to appeal from the order of referral. Rather he moved to dismiss the indictment thereafter returned, on the ground that the criminal court lacked jurisdiction. We gather that the jurisdictional infirmity is claimed to arise from a denial of due process of law because defendant was not afforded a hearing before the juvenile court. The motion to dismiss the indictment was supported by certified copies of the docket entries, the complaint, the order "on preliminary hearing to determine jurisdiction," and the letter transmitting the matter to the prosecutor. No effort was made to produce a transcript of what transpired upon defendant's appearance before the juvenile court.

In *State v. Van Buren*, 29 *N. J.* 548 (1959), we held that the proceeding before the juvenile court with respect to its retention of jurisdiction was in no sense a trial of a charge against the juvenile but rather (at *p.* 555) :

"Both the 1943 statute and the 1946 amendment relate to a familiar function of the State—the preliminary decision whether to proceed against an offender and, if so, under which statute if more than one may apply. In the ordinary situation that decision is left to the sound discretion of the county prosecutor as the State's representative in such matters. See *United States v. Thompson*, 251 *U. S.* 407, 40 *S. Ct.* 289, 64 *L. Ed.* 333 (1919) ; *Goldberg v. Hoffman*, 225 *F.* 2d 463 (7 *Cir.* 1955) ; *District of Columbia v. Buckley*, 75 *U. S. App. D. C.* 301, 128 *F.* 2d 17 (*Ct. App. D. C.* 1942), certiorari denied 317 *U. S.* 658, 63 *S. Ct.* 57, 87 *L. Ed.* 529 (1942). In the nature of things, legislation cannot anticipate all factual patterns and hence someone must be empowered on behalf of the State to decide when and in what manner its interests are best served. Here the Legislature authorized the juvenile court to make that preliminary decision, doubtless because of its specialization in this area, its familiarity with specific offenders and a greater likelihood of uniformity in the handling of juveniles."

We added that "A prosecutor's decision to act and his choice of a public remedy are *ex parte* determinations" (at *p.* 555), but nonetheless "The decision to retain or to relinquish jurisdiction is obviously meaningful to an alleged offender as well as to society, and hence, whatever may be thought of the demands of due process in this situation, fairness to both suggests that there be a hearing to aid the court in reaching a decision" (at *pp.* 555–556). The hearing, we said, should be limited to one appropriate to the preliminary nature of the question. We added (at *pp.* 557–558) :

"It is apparent from the preliminary nature of the jurisdictional decision and the many combinations of circumstances which may bear upon 'the welfare of society' that the range of the hearing which is appropriate will vary. The scope and detail of the hearing must be left to the sound discretion of the juvenile court. It must be kept in mind that there is no contested issue in the ordinary sense. Rather, the broad objective of the hearing is to enable the court to discharge its responsibility as the representative of the state. To that end it should afford the juvenile an opportunity to be heard

with respect to the facts which the court has received from the sources available to it and upon which it is inclined to relinquish jurisdiction. Thus, if the basic question is whether the juvenile is 'an habitual offender,' the court should inform the juvenile of the information revealed by its investigation, to the end that he may admit or deny it. If there is a denial, the court may wish proof if the area of dispute is critical. If the cardinal circumstance is a charge of a heinous offense, the court should reveal to the juvenile the charge as made by the State. The truth of the charge is not in issue; the question of fact is merely the existence of the charge. If the charge is murder, no more need appear to satisfy the court that the nature of the offense is heinous."

We note that the quotation immediately above begins with a reference to "the jurisdictional decision." The word "jurisdictional" was there used to refer to the question whether the juvenile court should retain jurisdiction. The expression was not intended to suggest that the "jurisdiction" of the criminal court depended upon the regularity with which the juvenile court arrived at the order of transfer. And so we have since held that a conviction for murder entered on a plea of *non vult* could not be set aside years later on the claim that the order of reference to the prosecutor was made *ex parte*, at least in the absence of a showing of prejudice in fact. *Goodlet v. Goodman*, 34 *N. J.* 358, 366–368 (1961).

On the face of the papers annexed to the motion, it appears that LaPierre was afforded a hearing, attended by him and his mother. There is no reference to counsel for LaPierre and we have no way of knowing what, if anything, transpired with respect to such representation. For present purposes we will assume, however, that he had no attorney and would have accepted an assignment of one.

In *State v. Tuddles*, 38 *N. J.* 565 (1962), we said that although there was no constitutional right to assignment of counsel, yet it was appropriate to provide for such aid (our rules have since been amended accordingly), and that where counsel was not provided, the juvenile court should entertain a motion to reopen to the end that the juvenile may, with the aid of counsel, present whatever he may wish within the limits set forth in *Van Buren*. We further held in *Tuddles*

that the juvenile court retained its authority to reopen the proceedings notwithstanding that an indictment had meanwhile been returned. Thus we recognized that the matter could simultaneously be within the jurisdiction of both the county court and the juvenile court in the sense and to the end that each tribunal could fully discharge its role, unimpeded by technicalities which can contribute nothing to the justice of the result. Hence the indictment was valid notwithstanding the failure to furnish counsel.

So here, the indictment was valid. Defendant's remedy, if he conceived that he was prejudiced by the lack of counsel before the juvenile court, was to make a seasonable application before it after counsel was assigned, as was done in *Tuddles*. We find nothing in the nature or circumstances of the case or in the record before us that suggests prejudice.

B.

■ LaPierre contends his motion for acquittal for lack of evidence should have been granted.

We think the evidence was ample to support a verdict of guilty. LaPierre agreed to steal a car, and participated in the search for one. LaPierre was to receive a "kickback" from the robbery in which the car was to be used. LaPierre, wearing dark glasses, was in the car during the search for a victim. There was evidence that he said that Hahn's tavern "looks good because it's dark and quiet." LaPierre loaned his hat to Russo just before Russo entered the tavern. During the holdup, LaPierre was in the car with motor running, and he came to Russo's aid when he called for it. True, LaPierre testified (and the State was in no position to prove otherwise) that he remained in the back seat until after he heard the shooting, but this was at best a circumstance to be considered with all the others. The evidence well warranted a finding that LaPierre joined a criminal plan to commit this holdup and acted in furtherance of it both by his participation in the preparations and by his presence at the scene.

*State v. Rosania*, 33 *N. J.* 267, 269–270 (1960); *State v. Smith, supra* (32 *N. J.*, at *p.* 521).

And of course the court was not required to accept La-Pierre's testimony that before his codefendants left the vehicle, he said "look Tony, don't do nothing on my account because I don't feel right about this place." It was for the jury to decide whether LaPierre was a party to the plan, and if he was, whether he in fact withdrew. It may be commented that the quoted statement of LaPierre implicitly revealed that he had been a party to holdup plans, contrary to his other testimony that in essence he just went along for a ride.

## C.

 LaPierre questions the trial court's charge to the jury with respect to the guilt of murder on the part of one who did not fire the fatal shots. The court charged extensively upon the subject and included LaPierre's requests to charge. The jury later asked to be reinstructed, and the court complied, again including LaPierre's requests. No objection was made to the initial or supplemental charge.

The criticisms advanced before us are extremely tenuous. As we understand the complaints, they are that the court used the term "concert of action" without defining it (La-Pierre's request contained the term, without definition), and that the charge was obscure as to what conduct would constitute participation which would incriminate for the ensuing murder. It seems to us that the instructions given were exhaustive. The court required a finding that LaPierre had the intent to rob, and that he associated himself with the attempted robbery as something he wished to bring about. The court defined aiding and abetting. The court explicitly charged that neither LaPierre's presence at the scene of the crime nor his assistance to Russo in the latter's flight, would, standing alone, suffice to prove that he was a party to the holdup. We do not understand what more could be said or how the meaning of "concert of action" could be more fully conveyed.

## D.

■ Finally, LaPierre complains because objection was sustained to the following question to prospective jurors:

"If you were on trial in the position of the State—meaning the prosecuting officials—or Robert LaPierre, would you be willing to be tried by twelve jurors of the same frame of mind that you are in now?"

The question was at best a complicated, circuitous inquiry into the capacity and willingness of a juror to judge impartially. A categorical answer either way would delay rather than advance the inquiry. It was within the trial court's discretion to sustain the objection. Frankly we do not see how it could have done anything else. *Roberts v. State,* 94 *Fla.* 149, 113 *So.* 726, 728 *(Sup. Ct.* 1927); *State v. Wakefield,* 111 *Or.* 615, 228 *P.* 115, 117 *(Sup. Ct.* 1924); *cf. Harris v. St. Louis–San Francisco Ry. Co.,* 60 *S. W.* 2d 652, 655 *(St. Louis Ct. App. Mo.* 1933). And since the court permitted interrogation which went directly to the juror's fitness and fairness, there could not in any event be any harm.

All of the judgments are accordingly affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR and HANEMAN—5.

*For reversal*—None.