**UNITED STATES of America ex rel. Edgar H. SMITH, Appellant,**

v.

**Howard YEAGER, Warden, New Jersey State Prison at Trenton.**

**No. 16128.**

United States Court of Appeals Third Circuit.

Argued May 4, 1967.

Decided Jan. 2, 1968.

On Rehearing March 15, 1968.

246

Stephen F. Lichtenstein, Lichtenstein & Levy, Trenton, N. J., for appellant.

Harold N. Springstead, Asst. Pros., of Bergen County, Hackensack, N. J., (Guy W. Calissi, Bergen County Pros., Hackensack, N. J., on the brief), for and of Counsel with plaintiff-respondent, Howard Yeager, Warden, New Jersey State Prison at Trenton.

Before STALEY, Chief Judge, BIGGS and HASTIE, Circuit Judges.

PER CURIAM.

This is an appeal from the denial of appellant's writ of habeas corpus by the United States District Court for the District of New Jersey. This court fully considered all the points now raised by appellant on the occasion of his first appeal to this court, United States ex rel. Smith v. State of New Jersey, 322 F.2d 810 (C.A.3, 1963), and we consider that opinion dispositive.

Appellant, however, urges that his rights must now be considered in the light of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The short answer to this contention is that the entire court considered this proposition on the first appeal. Townsend v. Sain was decided after the argument on Smith's first appeal, but before the case was decided and before the denial of Smith's petition for rehearing en banc by the majority of the entire court. Indeed, one of Smith's bases for requesting rehearing en banc was that Townsend v. Sain required this court to remand the case for a plenary hearing, and Smith's petition recites that "When Townsend v. Sain was decided, after the oral argument of this case, counsel advised this court by letter

that appellant would rely on that case with regard to his right to a full hearing." Thus both the original panel and the entire court considered the application of Townsend v. Sain to this case on the first appeal.

■ Moreover, it is clear that Townsend v. Sain is simply not relevant to this case now, nor was it on the first appeal because Smith was offered an evidentiary hearing on the first petition for a writ in the district court, and he rejected the offer. The record of this proceeding shows that the district court was very concerned that the record before it be full and complete and that Smith have every opportunity to put in the record all that he thought essential:

THE COURT: "Let me say this. There may have been some misunderstanding on our last discussion, but it was my thought, and I think I initiated the idea that I didn't want counsel on the side of the defendant, or the side of the state or anybody involved in this case feeling dissatisfied with the state of the record; that I wanted this record to be as complete as you thought it should be. * * * I just wanted everybody to be satisfied that they had, so far as they were concerned, this record in complete form so that here and later and wherever you may go, whoever takes the initiative of going from here to somewhere else would not be called upon to argue that this is incomplete and this matter really hasn't been heard as yet."

Later on in the same proceedings, Smith's then-attorney stated:

*"The United States Supreme Court says your Honor may hold a hearing de novo if need be to go into the historical facts behind this case. I don't think it is necessary here.* I think if your Honor limits himself to the record, I think that the error, the fundamental constitutional error in this case is so overwhelming that I need not stand here and argue this case at any great length.*

"Now, if we understand each other, so there will be no mistake about it, we rely solely and wholly upon this amendment and supplemental petition your Honor now has before you with the exceptions that I noted at my last appearance of Exhibit C attached to the original petition, which is the excerpts of the statutes. * * * With that addition, I say we rely solely upon this amended and supplemental petition. * * *" (Emphasis supplied.) Thus there can be no doubt that the district court offered, and Smith's counsel rejected, an evidentiary hearing.

The order of the district court will be affirmed.

BIGGS, Circuit Judge (dissenting).

On consideration of the facts of the case at bar and what I deem to be the applicable law I must respectfully dissent.

STATEMENT OF FACTS

The relator-appellant Smith, convicted of murder in the first degree and sentenced to death, for the second time in this court seeks release by a federal writ of habeas corpus. A brief history of the protracted litigations involving Smith is set out below.[1] These litigations will be referred to at greater length hereinafter.

A fifteen year old girl, Vickie Zielinski, was brutally murdered under circumstances which tended heavily to incriminate Smith. Her body was found about 9:20 A.M. on March 5, 1957, in a deserted area known as the "Sand Pit" in Bergen County. About 11:30 P.M. on March 5, police arrested Smith on information supplied by Gilroy who had loaned an automobile to Smith. On the night of March 5, Smith went to bed at 7 P.M., but at 7:30 P.M. his wife wanted to visit her mother's house in Ridgewood. Smith went to bed again at approximately 10 P.M. at the Ridgewood house and soon fell asleep. He was awakened by the police and taken to the police headquarters in the Township of Mahwah. The record shows that Smith had no sleep from about 8:30 A.M. on the morning of March 5 until about 3:45 P.M. on March 6, 1957, a period of about 31 hours with the exception of perhaps an

---

1. Smith's conviction was affirmed by the Supreme Court of New Jersey. State v. Smith, 27 N.J. 433, 142 A.2d 890 (1958). A petition for habeas corpus was dismissed by the United States District Court apparently for failure to exhaust state remedies. Smith did not apply immediately for certiorari to the Supreme Court of the United States but moved for a new trial chiefly on the ground of newly discovered evidence. The motion was denied, and the denial was affirmed by the Supreme Court of New Jersey. State v. Smith, 29 N.J. 561, 150 A.2d 769 (1959). Certiorari was denied by the Supreme Court of the United States, 361 U.S. 861, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959). Smith again sought habeas corpus in the United States District Court for the District of New Jersey. The writ was denied. U. S. ex rel. Smith v. State of New Jersey, 201 F.Supp. 272 (D.N.J. 1962). This court affirmed, 3 Cir., 322 F.2d 810, Circuit Judge Ganey dissenting. A petition for rehearing before this court en banc was filed and was denied by a 5 to 2 decision, Judge Ganey and the present writer dissenting. The Supreme Court denied certiorari, 376 U.S. 928, 84 S.Ct. 678, 11 L.Ed.2d 623 (1964), Mr. Justice Douglas dissenting. The petitioner then filed a Petition for Post-Conviction Relief which was denied by the Bergen County Court on April 17, 1964 and that denial was affirmed by the New Jersey Supreme Court. State v. Smith, 43 N.J. 67, 202 A.2d 669 (1964). The Supreme Court denied certiorari, 379 U.S. 1005, 85 S.Ct. 731, 13 L.Ed.2d 706 (1965), reh. denied, 380 U.S. 938, 85 S. Ct. 945, 13 L.Ed.2d 826 (1965). A subsequent Petition for Habeas Corpus was denied by the Bergen County Court on March 29, 1965 and leave to appeal was denied by the New Jersey Supreme Court on April 13, 1965. A further Petition for Reconsideration was denied on June 22, 1965. Thereafter, on July 13, 1965, the present, the Second Petition for a Writ of Habeas Corpus was filed in the United States District Court for the District of New Jersey and was denied as was an Application for Reconsideration. The appeal at bar followed. State Court remedies have been exhausted.

hour and a half on March 5. About 10 A.M. on March 6 he broke down, cried, and asked for a Catholic priest. At this time the police had possession of the car that Smith used on the night of the crime which contained a bloodstained mat. The police also had obtained Smith's shoes and socks worn by him on the night of the murder and an admission from him that he was at the scene of the crime with Zielinski and also that he had given her "a good shot", a strong blow. Smith was not informed of his right to remain silent, of his right to counsel, or that anything he said might be used against him. I will discuss Smith's allegations as to his treatment by the police at a later point in this opinion. See note 12, infra. Smith was not formally charged with murder at the time of this interrogation but it is clear that he was vehemently suspected.

In Smith's statement, as transcribed, appear many incriminating facts. Although he did not categorically admit that he had killed Zielinski his statement in substance constituted a confession. Shortly thereafter he was indicted on a charge of first degree murder. About 5 days after the interrogation and after indictment, deLisle, a police detective, came to Smith in jail and asked him to sign a transcript of his statement, some 39 pages in length, which the reporter had transcribed from his notes. Smith had employed counsel at some date not clear from the record but prior to deLisle's visit. Smith refused to sign the transcript, informing deLisle that his counsel had advised him not to do so. deLisle asked Smith to read the statement, however, and later drew from him an admission of its correctness. Under the law of New Jersey it is unnecessary that an accused sign a confession to make it valid, only that he read it and acknowledge its correctness. State v. Cleveland, 6 N.J. 316, 327–330, 78 A.2d 560, 565–567, 23 A.L.R. 2d 907 (1951). Smith testified at his

trial that he was not mistreated. Issues relating to the voluntariness of Smith's statement and his admission of its correctness will be dealt with at greater length at a later point in this opinion.

Smith was found guilty of first degree murder and since there was no recommendation of life-imprisonment he was sentenced to death as required by the law of New Jersey. An appeal was taken from the judgment of conviction to the Supreme Court of New Jersey, which affirmed. State v. Smith, 27 N.J. 433, 142 A.2d 890 (1958). Smith made no immediate application for certiorari, but moved for a new trial principally on the ground of newly discovered evidence.[2] His motion was denied and the denial was affirmed by the Supreme Court of New Jersey, 29 N.J. 561, 150 A.2d 769 (1959). Smith then petitioned for certiorari which was denied. Smith v. New Jersey, 361 U.S. 861, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959). Smith next sought habeas corpus in the court below. The writ was denied him. 201 F.Supp. 272 (1962).

The court below, Judge Lane, wrote an exhaustive opinion, dividing Smith's arguments into three main groups, "I. Issues Not Raised in the State Courts", "II. Issues Raised in the State Courts", and "III. Issues Raised in Part in the State Courts". Judge Lane described Smith's contention by setting out twelve categories, as follows: (1) an accumulation, combination and aggregation of errors in the State Court, allegedly constituting a denial of due process; (2) the assertion that the State should produce a tape recording of a "truth serum", a sodium amytal, test that had been administered to Smith; (3) a contention that Smith was unlawfully arrested; (4) that Smith was not given the opportunity to object to the trial court's charge before the jury retired; (5) that after the rape-murder theory of the case advanced by the State was

---

2. See the items constituting alleged newly discovered evidence as set out in the opinion of the Supreme Court of New Jersey

in State v. Smith, 29 N.J. 561, 150 A.2d 769 (1959).

declared by the trial judge to be insufficiently supported by the evidence, there was no adequate charge to remove this issue from consideration by the jury;[3] (6) that Smith's trial counsel was inadequate; (7) that a new trial was improperly denied; (8) that the charge of the trial court on the issue of the voluntary nature of Smith's admissions was fundamental error; (9) that the admissions of Smith, in substance constituting a confession were involuntary; (10) that the judge did not allow the jury to consider the alleged non-voluntary nature of Smith's statement after he had determined that they were voluntary; (11) that the trial court was in error in failing to charge properly and lawfully as to Smith's defenses, and (12) that the charge of the trial court was erroneous in that there was failure to charge as to all possible degrees of homicide, including manslaughter.

Judge Lane decided that the issues presented by the first eight categories had not been raised in the New Jersey State Courts and that therefore Smith had not exhausted his state remedies in respect to them as required by 28 U.S.C. Section 2254. As to the eleventh and twelfth categories, Judge Lane found that Smith failed to exhaust his state remedies on parts of those claims. As to the other parts, Judge Lane agreed with the holding of the New Jersey Supreme Court that no error had been committed by the trial court in charging the jury as to Smith's asserted defenses and in exploring the difference between first and second degree murder. Judge

Lane devoted most of his opinion to categories nine and ten, respecting the voluntary or involuntary nature of the incriminating statement made by Smith, his admissions. He concluded that Smith's admissions contained in the statement were voluntary and were admissible. See Id., supra, at 276–282.

It would appear that Judge Lane, however, did not hold a plenary evidentiary hearing on the issue of the voluntariness of Smith's statement or confession. The majority opinion states that such a hearing was offered by Judge Lane to Smith but that his counsel rejected it, quoting the colloquy between Judge Lane and Smith's counsel. I am far from certain, however, that there was an offer of an evidentiary hearing or that Smith's counsel rejected it.[4] Judge Lane had oral argument and ordered produced and had before him (1) the transcript of Smith's trial, (2) the transcript of the hearing on the motion for a new trial, and (3) the briefs and appendix on the first appeal to the Supreme Court of New Jersey and on the second appeal to that Court and also the petition for certiorari to the Supreme Court of the United States.

The denial of habeas corpus by Judge Lane was affirmed by this court on July 24, 1963, two judges, dissenting, one on denial of rehearing, 322 F.2d 810 (1963). This court held, inter alia, that Smith's statement was voluntary and that any issues presented by the failure of the State to produce a tape recording in relation to the use of a "truth serum", sodium amytal test, hereinafter referred to, were not properly before Judge Lane and

3. See p. 976a of Smith appendix on his appeal from the judgment of conviction to the Supreme Court of New Jersey at docket #2359. See State v. Smith, 43 N.J. 67, 202 A.2d 669 (1964).

4. The matter is far from clear. Judge Mendon Morrill had been conducting the habeas corpus proceeding. Upon his death the case was assigned to Judge Lane. Judge Lane permitted counsel to file a supplemental habeas corpus petition and an answer thereto. The colloquy between Judge Lane and counsel

seems to me to be directed to the issue of whether or not the case would proceed upon the original petition for habeas corpus and answer, the supplemental petition for habeas corpus and answer, or on both sets of pleadings. See pp. 121a to 127a of the Appellant's Appendix. In any event Judge Lane could not have had the decision in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), before his eye because at the time of the hearing referred to the opinion of the Supreme Court had not yet been handed down.

therefore not adjudicable on appeal. This court also stated: "It is very plain that the trial judge, under the governing law of New Jersey at that time, held an adequate preliminary hearing as to the voluntariness of the statement. It is also very plain that his decision that the statement was in the nature of a confession and that it was voluntary, was fully supported by the evidence." [5] No express ruling was made in respect to the acknowledgment by Smith of the correctness of his incriminating statement to deLisle. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 had been decided on March 18, 1963. The Supreme Court denied certiorari, 376 U.S. 928, 84 S.Ct. 678, 11 L.Ed.2d 623 (1964), Mr. Justice Douglas dissenting. But see Sobell v. United States, 344 U.S. 889–890, 73 S.Ct. 180, 97 L.Ed. 687 (1952), opinion by Mr. Justice Frankfurter.

Later, in 1964, Smith brought a proceeding for post-conviction relief in the New Jersey Bergen County Court. R.R. 3:10-a-1 to 3. Relief was denied. He then appealed to the Supreme Court of New Jersey raising many issues, some of which had been previously raised in the habeas corpus proceeding before Judge Lane hereinbefore referred to and, as appears, were adjudicated by this court. Some of the issues raised in the Supreme Court of New Jersey were those which Judge Lane had found had not theretofore been raised in the State Courts. The issues raised before the Supreme Court of New Jersey included (1) objections to the adequacy of the charge on several grounds; (2) the assertion that the issue of the voluntariness of Smith's confession was decided by the trial judge without the intervention of the jury: (3) the contention that the trial court erred in failing to charge on manslaughter; (4) the assertion that Smith was not bound in the post-conviction proceedings by the determination of

issues by the denial of his motion for a new trial; (5) the argument that the State misused evidence relating to the so-called "truth-serum examination"; (6) the contention that certain physical property, such as articles of clothing, had been obtained by illegal search and seizure and were therefore not admissible in evidence; (7) the contention that the trial court failed to admit into evidence the fact that Smith had offered to submit to a lie detection test, and (8) the assertion that Smith's statement should have been excluded because he had no counsel when the incriminating statement was made or at the time when the State alleges that he admitted that the transcript of his incriminating statement was correct. The Bergen County Court, insofar as the record of the post-conviction proceedings before us shows, did not receive any evidence on the issue of whether Smith's incriminating admissions and his alleged affirmation of them were voluntary.

The Supreme Court of New Jersey ruled against Smith's contentions in respect to the inadequacy of the charge to the jury on the ground that his objections could not be urged by way of post-conviction relief. In respect to items "(2)", "(6)" and "(8)" the Court ruled that on the state of the law as it was at the time of Smith's trial, he had not been denied due process of law. As to item "(5)" the Court held that Smith's contention was invalid because he had failed to raise the issue at trial. Post-Conviction relief was denied, and Smith's stay of execution was vacated. State v. Smith, 43 N.J. 67, 84, 202 A.2d 669, 678 (1964). Certiorari was denied by the Supreme Court, 379 U.S. 1005, 85 S.Ct. 731, 13 L.Ed.2d 706, reh. denied, 380 U.S. 938, 85 S.Ct. 945, 13 L.Ed.2d 826 (1965). Subsequently, a petition for habeas corpus was denied by the Bergen County Court on March 29, 1965,[6]

5. See United States v. State of New Jersey, 322 F.2d 810, at p. 817 (1963), decided July 24, 1963, reh. denied September 9, 1963. Judge Lane had made a sub-

stantially similar ruling, 201 F.Supp. at 278–282.

6. Efforts to procure complete records from the lower New Jersey State Courts of

and leave to appeal was denied by the New Jersey Supreme Court on April 13, 1965. That Court also denied a petition for reconsideration on June 22, 1965.

On July 13, 1965, a second petition for habeas corpus was filed in the court below. This petition was enlarged by a supplement and eventually by an additional pleading designated as an "Application for Reconsideration". These are the pleadings presently before us. The bases for the relief sought were much enlarged by these pleadings. There was no plenary evidentiary hearing in the Court below, Judge Lane being apparently of the view that no substantial new constitutional issues were presented. The writ was denied and the appeal at bar followed. The allegations of the second petition for habeas and its supplements will be examined after discussion of the inquisition of the Bergen County Trial Court into the voluntariness of Smith's incriminating statement and his admission as to its accuracy.

Prior to any determination at Smith's trial as to whether Smith's admissions had been voluntarily obtained and prior to their admission into evidence, four witnesses testified in the presence of the jury that Smith's statement was given voluntarily. The reporter who took Smith's statement was the fifth witness to testify before the jury as to the voluntary nature of the statement and its contents. The prosecutor then offered the statement in evidence. At this time Smith's counsel objected because he had not read the statement and doubted whether it met the legal requirements necessary to constitute a confession. Smith's counsel at that time also stated

that he had no doubt that the confession was voluntary. Thereafter, having read the statement, Smith's counsel did object to the statement's admission into evidence but only on the ground that it did not constitute a confession under the law of New Jersey. At this point the jury was finally excused. There followed a colloquy between the prosecutor, Smith's counsel and the trial judge during which Smith's counsel made it clear that he did question the voluntariness of the statement.[7]

After the jury had withdrawn the trial court heard further evidence as to the voluntariness of Smith's statement. Smith himself testified, but he neither categorically admitted nor denied the voluntariness of his statement. He testified that his interrogation lasted for approximately ten and a half hours, that he was kept substantially without food and subjected to questioning by a battery of police officers. After the jury returned Smith again took the witness stand. He testified that he gave the statement because he was in fear of Hommell who he at least impliedly asserted was the actual killer, that he was questioned by a great many police officers, that the police pulled a sample of his hair from his head, that he had very little food, that he was without sleep for approximately thirty-one hours, and that his fingernails were clipped. The trial court found Smith's incriminating statement to have been given voluntarily and that it constituted a confession under the law of New Jersey. The transcript of the statement was admitted into evidence when the jury returned. Later, Detective deLisle testified as to the alleged acknowledgment by Smith of the accuracy of the transcript,

---

Smith's post-conviction applications for relief have proved unavailing. I am, therefore, forced to assume that no issues were decided by them except as indicated in this opinion. It is noted that in Townsend v. Sain, 372 U.S. 293, 319, 83 S.Ct. 745, 9 L.Ed.2d 770, it was held that in the absence of a state court record a Federal court may, and in some instances must hold an evidentiary hearing.

**7.** "Mr. Selser [Smith's counsel]: * * * I think too I should like to call Smith

with regard to it [the statement] and have some testimony taken with regard to the circumstances preceding the taking, up to the time of the taking.

"The Court: As to the voluntariness?

"Mr. Selser: Yes, as to the voluntariness, as to his state of mind and the circumstances, all of which led up to the event, all of which would go into the voluntariness of the statement." Appendix to Appellant's brief in the Supreme Court of New Jersey, p. 537a.

testimony the truth of which Smith denied. Smith's counsel made no objection to the admission of deLisle's testimony as to the alleged acknowledgment of its accuracy by Smith, without which the transcript would have been inadmissible.

In my view the incriminating admissions of Smith constituting the statement set out in the transcript, and Smith's acknowledgment of the accuracy of that transcript, may not be considered separately. They are logically inseparable and together present an issue of voluntariness under the Fourteenth Amendment. The Bergen County Court at Smith's trial did not consider these two elements in unity. No inquiry was made as to the voluntariness of Smith's acknowledgment of the accuracy of his statement to deLisle. Indeed, deLisle was not subjected to any meaningful cross-examination.[8, 9] The State's witnesses were scarcely cross-examined at

all. All relevant facts were not presented at the State Court hearings. I emphasize again that Smith was not warned of his rights and that this admitted fact was not brought upon the record except perhaps by implication. There was no other fact inquiry. I cannot deem the examination of this issue to have been sufficient to meet constitutional requirements.[10]

But it is necessary to deal now with the issues presented by Smith's second petition for habeas corpus, its supplement and the application for reconsideration by the court below.[11] If these lengthy pleadings be examined and their allegations contrasted with the evidence given by the witnesses at the inquiry by the Bergen County Trial Court into the voluntariness of Smith's incriminating statement, it will be observed how comparatively little evidence that Court had before it relating to the period between the time when Smith was first taken into

8. Smith's trial counsel's cross-examination consisted of two questions: "Q. Who was his lawyer then? A. I think a Mr. Gaudielle. Q. I was not then his lawyer, was I? A. I don't think so." See 521a of Appendix filed in the Supreme Court of New Jersey at Docket No. 2359. See note 3, supra.

9. We cannot deem the failure of Smith's counsel to object to be a waiver of a constitutional right by Smith. See the doctrine of fundamental error, McNello v. John B. Kelly, Inc., 283 F.2d 96, 101–103 (3 Cir. 1960). See also 28 U.S.C. Section 2106. Cf. Rule 51, Fed.R.Civ. Proc., 28 U.S.C.

10. The Supreme Court's decision in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), which held Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1964), to be nonretroactive, emphasizes the importance, one of long standing, of the protection to be accorded under Townsend v. Sain, supra. Mr. Chief Justice Warren stated, Id. at 730, 86 S.Ct. at 1779:

"At the same time, our case law on coerced confessions is available for persons whose trials have already been completed, providing of course that the procedural prerequisites for direct or collateral attack are met. See Fay v.

Noia, 372 U.S. 391 [83 S.Ct. 822, 9 L.Ed.2d 837] (1963). Prisoners may invoke a substantive test of voluntariness which, because of the persistence of abusive practices, has become increasingly meticulous through the years. See Reck v. Pate, 367 U.S. 433 [81 S.Ct. 1541, 6 L.Ed.2d 948] (1961). That test now takes specific account of the failure to advise the accused of his privilege against self-incrimination or to allow him access to outside assistance. See Haynes v. [State of] Washington. 373 U.S. 503 [83 S.Ct. 1336, 10 L.Ed.2d 513] (1963); Spano v. [People of State of] New York, 360 U.S. 315 [79 S.Ct. 1202, 3 L.Ed.2d 1265] (1959). Prisoners are also entitled to present evidence anew on this aspect of the voluntariness of their confessions if a full and fair hearing has not already been afforded them. See Townsend v. Sain, 372 U.S. 293, [83 S.Ct. 745, 9 L.Ed.2d 770] (1963). Thus while *Escobedo* and *Miranda* provide important new safeguards against the use of unreliable statements at trial, the nonretroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim."

11. For the sake of brevity we will refer to these conglomerate pleadings as the "second petition for habeas corpus".

custody by the police and the time when he gave his incriminating statement. But the period of time referred to is of vital significance in ascertaining the voluntariness of Smith's statement. The allegations of the petition are fairly set out in the relator's brief and are quoted verbatim in the footnote below.[12] Some

12. As follows: Smith's first contact with the police came when he was taken into custody at about 11:00 p. m. on March 5, 1957. He had just gotten into bed when the police arrived and told him they wanted him to go with them to the Mahwah Police Station. The police gave no specific reason for their request. Smith had been awake since 8:30 that morning, and when taken into custody by the police he had been without sleep for 14½ hours. In addition, he had been ill for several days and still was unable to eat solid foods. At Mahwah he was taken to a small office and interrogated by Prosecutor Calissi, Assistant Prosecutor Galda, Mahwah Police Chief Smith, Captain De Marco of the prosecutor's office and several other police officers. He was not advised of any rights he might have. During this time Prosecutor Calissi asked him if he would consent to a lie detector test, telling him it could not hurt him if the story were true and that in any event it could not be used in Court. Smith said he would prefer to see a lawyer before consenting. Captain De Marco said the county prosecutor should know better than any lawyer, but Smith continued to refuse the lie-detector test and the subject was dropped.

After this questioning, the next five hours were spent in three or four trips to various places, including two trips to the scene of the crime. Between these trips, Smith either was interrogated or required to sit in the Municipal Courtroom. The respites from interrogation did not total more than one half hour, and during this period he could not smoke nor speak except in response to questions. He was always guarded by one of the detectives. Detective Sinatra was at his side all night long, including in the men's room. During the night he asked Captain De Marco if he could phone his wife because she might be waiting up for him. He was told by the Captain that he did not have authority to permit that.

During the trips he was asked continually to tell his story, to "tell it again". Sinatra sat in the back seat of the car with him on every trip and Sinatra constantly repeated that he would hate to be asked the same questions over and over and that if he (Sinatra) had something to say he would want to say it and would then feel better. It seemed to Smith that Sinatra would ask him every few minutes how Smith thought the guy who "did this" must feel "right now." Sinatra would answer his own question by saying "the guy is probably wishing he could talk to someone and get it off his chest."

At about 5:00 a. m., Smith was taken by Captain De Marco and Detective Sinatra to De Marco's home where the Captain left them and told Sinatra to take Smith to a diner for breakfast. At the diner Smith ordered eggs, toast and coffee but his stomach was still upset and he could not eat the eggs. The cup of coffee was his second since being taken into custody; he finally was permitted to smoke. He asked again if he could stop and see his wife since the diner was only a couple of blocks from his mother-in-law's home, but Sinatra would not permit that and would not permit Smith to phone her.

From the diner Sinatra picked De Marco up at his home and drove Smith to the Hackensack office of the County Medical Examiner, Dr. Gilady. The doctor stripped Smith naked and examined him. Smith was not told that he was going to be examined nor was he told the purpose of the examination. He was not told of any right to refuse the examination. He was examined by the doctor in the presence of several police officers. Thereafter, he was taken to the prosecutor's office in the County Court House, at about 8:30 a. m. By that time he had been in custody 9½ hours and without sleep for 24 hours.

In a small side office at the prosecutor's office, a photographer arrived and photographed Smith's knees. Shortly after the photographs were taken and after repeated requests, Smith was permitted to phone his wife. Prior to requesting this permission to telephone his wife, he had requested and been denied permission to call an attorney. He asked and was also denied permission to call a Judge Dwyer, a former county judge and the father of a personal friend. He was told by a detective that there was no need for him to call an attorney because the prosecutor was a "good guy" who only "hated bookies" and that he would see to it that Smith got a "fair shake." The detective told Smith of another defendant, a "poor guy" who could not afford a lawyer but who would get a good break from the prosecutor because he "cooperated." He told Smith also that the prosecutor was a member of

of the facts referred to were testified to at the Bergen County trial, but very many were not. One of the apparent is-

the Knights of Columbus and a good Catholic who would treat him right. Smith again asked to be allowed to call an attorney and was told that he could call only his wife and to stop being "smart." At this time Smith had been awake more than 24 hours and did not feel like arguing.

A detective asked Smith his wife's telephone number, the number was checked in the telephone book and the call was put through by a detective. He was advised not to worry his wife because he would not need a lawyer. He was allowed to speak to his wife for a few minutes and during this period asked her to contact Judge Dwyer, who is his friend and ask him to seek his release from custody. He was then told that was all he could say and to hang up. After he hung up a detective asked him if he knew the Judge and said he should not have bothered him because he did not need an attorney.

Shortly after the telephone call to his wife, he saw her standing in a corridor outside the office in which he was being questioned. He was told that she also was being questioned. Several times throughout the rest of the day he requested permission to see his wife, and was denied such permission. He was told he could see her and she could go home when Smith started "giving a few answers."

Smith later learned that his wife had been picked up by a county police radio car immediately after his phone call, that she was denied permission to speak with him, that she was told she could not call a lawyer because Smith did not need a lawyer, and that she was not permitted to call anyone until later in the day when his confession had been secured.

Following the telephone call to his wife, detective Spahr made Smith strip naked again and removed his clothing from the room. Before he left he told Smith to remain standing but after he left de Lisle told Smith he could sit. Spahr returned in a few minutes and shouted to Smith, "Who the hell told you to sit?" De Lisle said he had allowed Smith to sit whereupon Spahr pushed him back into the chair. This routine was performed three or four times. At one point Smith was pushed over the chair and onto the floor. After this incident de Lisle talked with Smith for a period of time and told him the questioning would go on until he told the truth, that it would be better to clear things up, that his wife whom Smith had

sues left uninvestigated is the asserted administration of sodium amytal in the so-called "truth-serum" test to Smith,

seen standing in the corridor was worrying and waiting to see him. Spahr then returned and told Smith that a priest from Don Bosco High School was waiting to see him and Smith was given a gray coverall to wear, which he later learned was a county jail work uniform. Up to this point Smith had been naked.

With regard to the priest, Smith alleges that he had never seen the priest before in his life, that he did not know his name, that he denied the crime when the priest asked him if he had done it, that he asked the priest to see his wife and find out if she had obtained a lawyer but the priest's response was that he could not help his wife because she was not a Catholic.

By noon on March 6, 1957, after continued questioning, after being refused all requests to see his wife, after being denied requests to call his lawyer, after being told that his trousers had been identified by his wife, that she was being questioned and had signed a statement, after being told that laboratory tests of his clothing had proved that he had been with the victim, that his wife was crying and he could see her as soon as he made a statement and that his wife would be taken home after he had "talked", he agreed to make the statement. Captain De Marco had told him how he thought the crime had been committed. It was Smith's hope to make a brief statement, without admitting guilt, which he could repudiate after seeing his attorney. He was tired, having been awake for 27½ hours, and was ready to do and say anything he was told.

After the statement had started but before Smith was taken outside, the prosecutor told him to wash and shave because photographers were outside and he looked terrible. He had been wearing the coveralls, and his clothing was returned to him.

Certain of the allegations made by Smith are supported by his mother. His mother's affidavit, concerning many facts which were told to her by Smith's then wife who was 19 years old, are supported to some degree by a statement taken of Smith's former wife by present counsel on August 5, 1965 in the presence of the former wife's new husband and her attorney. The gist of this affidavit is that almost immediately after Smith had called his wife and asked to call Judge Dwyer, she had been picked up by detectives from the prosecutor's office, and between the

even though this was done at the request of Smith's own counsel. Smith asserts the information elicited from him on the occasion of the administration of the drug was employed by the State of New Jersey unfairly and unlawfully and that his trial was prejudiced thereby. Another issue left undecided is that the Bergen County trial court did not charge the jury that if Smith was guilty of first-degree murder without recommendation of life imprisonment the imposition of the death penalty was mandatory. The facts relating to these allegations should be explored and found by the trial court.

Whatever may be the status of our former decision in United States v. State of New Jersey, supra, filed July 24, 1963, Smith's constitutional rights should now be reconsidered in the light of Townsend v. Sain for the principles of that decision are applicable retroactively and the doctrine of res judicata is not available in the habeas corpus proceeding presently before us. See Kimbro v. Heer, Warden, 386 U.S. 128, 87 S.Ct. 902, 17 L.Ed.2d 778 (1967), in which the Supreme Court vacated *Per Curiam*, a judgment of the Court of Appeals for the Sixth Circuit handed down in Kimbro v. Heer, Warden, 364 F.2d 116 (1966), and remanded the case to the District Court, citing Townsend v. Sain. Similar action was taken by the Supreme Court in Green v. Bomar, 379 U.S. 358, 85 S.Ct. 441, 13 L.Ed.2d 541 (1964).

In view of the foregoing, I would vacate the judgment of the court below and would remand the case for a plenary evidentiary hearing on the issues indicated in this opinion and any others which the court below might deem relevant. If the court below found facts and conclusions of law in favor of the State of New Jersey, some of the issues discussed herein would be adjudicated. If those issues were decided in Smith's favor, habeas corpus should then be granted by the court below and a new trial required. In either event issues involving the application of principles enunciated in Escobedo v. State of Illinois, 378 U.S. 486, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964); Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); and in associated decisions, may require determination.[13] If the second contingency comes to pass it would be presumptuous to suggest herein now how the principles of the decisions referred to should be applied by the New Jersey State Tribunals. If the first contingency eventuates, the court below should apply the principles of the decisions referred to insofar as they are pertinent. To state views now in the absence of findings of fact and conclusions of law by the court below, respecting the application of those principles would be futile. Moreover, the Supreme Court has made it clear that constitutional issues should not be decided except upon a full record. Honeyman v. Hanan, 300 U.S. 14, 25–26, 57 S.Ct. 350, 81 L.Ed. 476 (1937); Villa v. Van

time of his call to her and the time she was picked up by police she had not had a chance to call either Smith's mother or Judge Dwyer. She was taken to the prosecutor's office and questioned by detectives and asked to identify Smith's pants. She asked many times for permission to see Smith but this was denied. She was told that Smith was there only for routine questioning, that they were questioning other people and that he did not need a lawyer. She was not returned to her mother's home until about 4:10 p. m., after Smith had given his statement. It is apparent from the af-

fidavit of Smith's mother, taken together with Smith's allegations that he had called his wife and shortly thereafter caught a glimpse of her in the corridor while he was being held in a room, that the prosecutor had seen to it that Smith's wife was picked up prior to her being able to obtain a lawyer for her husband.

13. I point out that though issues have been raised by the relator-appellant respecting the possible application of the principles enunciated in these cited cases the majority opinion in no wise directs itself to the problems presented.

Schaick, 299 U.S. 152, 155–156, 57 S.Ct. 128, 81 L.Ed. 91 (1936).

## OPINION OF THE COURT

Before HASTIE, Chief Judge, and McLAUGHLIN, KALODNER, STALEY, FREEDMAN, SEITZ and VAN DUSEN, Circuit Judges.

### PER CURIAM.

The petition for rehearing in this case has been considered and presents no new argument. A majority of the circuit judges in regular active service not having voted for rehearing in banc, the petition for rehearing will be denied.

FREEDMAN, Circuit Judge (dissenting).

Judge Biggs' dissent from the majority opinion of the panel raises for me sufficiently grave questions to require rehearing before the court en banc.

The majority opinion of the panel declares that "all the points now raised by appellant" were "fully considered * * * on the occasion of his first appeal to this court" in United States ex rel. Smith v. State of New Jersey, 322 F.2d 810 (3 Cir. 1963) cert. denied, 376 U.S. 928, 84 S.Ct. 678, 11 L.Ed.2d 623 (1964). The panel majority therefore "consider that opinion dispositive" of this second appeal. It seems to me, however, that three claims in this second petition for habeas corpus were not adjudicated in our prior decision.

(1) Appellant claims that his confirmation of his confession, given after his indictment, was unconstitutionally obtained because it was taken outside the presence of his counsel, contrary to the subsequent rule of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), which he contends is retroactively applicable to his case. While the facts on which this claim is made were in the first petition for federal habeas corpus this contention obviously could not have been advanced in the first case either in the district court or on appeal to us, for Massiah was handed down after we decided the first appeal.

(2) Appellant claims that evidence against him was obtained as a result of information involuntarily extracted from him by the use of a truth serum. This claim substantially was presented in appellant's first petition for federal habeas corpus, but it was not considered either in the district court or by us on appeal because of failure to exhaust available state court remedies.

(3) Appellant claims that he was deprived of due process because the jury was permitted to render a verdict of guilty of first degree murder which automatically required the imposition of the death penalty without being informed that this consequence would follow unless they made a recommendation of mercy. This claim was not raised in the first petition for federal habeas corpus and was not involved in the first appeal.

I say nothing of the merits of these contentions. It is enough for me that they were not previously adjudicated and are now lost in the majority's conclusion that the first appeal is dispositive of the present one.

Appellant also claims that he is entitled to a federal court hearing on the voluntariness of his confession because the state court record is inadequate under the expanded right to a hearing recognized in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).[1] This claim was rejected by the district court on the ground that it was adjudicated by our decision on the first appeal. The panel majority now affirms this and adds that although the first appeal was argued before Townsend v. Sain was handed down, its application to appellant's first appeal was considered by the first panel in rendering its decision and by the court en banc in refusing a petition for rehearing in which Townsend was expressly relied on.

---

1. See also the new habeas corpus act, 28 U.S.C. § 2254(d).

I find this answer to appellant's claim unpersuasive because appellant makes substantial allegations in the present proceeding which do not appear in the prior federal habeas corpus proceeding or in the state court record and which go to the question of the voluntariness of his confession and therefore affect the adequacy of the state court record.

For example, appellant now alleges for the first time that during his interrogation before making his confession he was forced to strip naked and was left in a room with two detectives who taunted him, pushed him, and knocked him down. He alleges that during this episode the detectives told him that they would question him until he told them the truth and that his wife whom he had seen in the corridor was worried and was waiting for him. He also adds now, among other new allegations, that his statement was made after the police told him that his wife, who was being held by them, would be released when he "talked".

The fact that appellant did not present such facts in his first petition for federal habeas corpus should not preclude our consideration of them now. That proceeding occurred prior to Townsend v. Sain, when a federal plenary hearing was considered primarily a matter of grace rather than of right (Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953)) and when counsel could readily have believed that allegations such as these would be unavailing.

I also do not believe appellant's claim that he is entitled to a federal habeas corpus hearing may be rejected summarily on the ground of waiver, even if the language of his then counsel, quoted in the majority opinion of the panel, is construed as an expression of belief that the state court record was adequate and that a federal hearing therefore was unnecessary. It is clear that counsel will not be deemed to have waived a right which did not exist at the time. To me it is equally incredible that counsel should be said to have waived in its entirety a right which existed only partially at the time.

Even if it could be said that counsel had waived expressly and completely all right to a federal hearing, I have serious doubt that such a waiver should be held binding on a defendant in a capital case. We should be on guard against applying to a defendant in such a case a doctrine which would estop him from the assertion of rights which might save his life because of an erroneous judgment of his lawyer which does not deal with the merits of his claim.

I therefore believe the case should be reheard before the court en banc and dissent from the denial of the petition for rehearing.